*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0290p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

————————————

KENNETH RAY ADKINS,

        *Plaintiff-Appellant,*

    *v.*

BASIL WOLEVER,     *Defendant-Appellee.*

No. 11-1656

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:03-cv-797—Hugh W. Brenneman, Jr., Magistrate Judge.

Argued: June 6, 2012

Decided and Filed: August 29, 2012

Before: KEITH, McKEAGUE, and DONALD, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** Joseph M. Infante, MILLER, CANFIELD, PADDOCK AND STONE, PLC, Grand Rapids, Michigan, for Appellant. Michael R. Dean, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Joseph M. Infante, MILLER, CANFIELD, PADDOCK AND STONE, PLC, Grand Rapids, Michigan, for Appellant. Michael R. Dean, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

————————————

## OPINION

————————————

BERNICE B. DONALD, Circuit Judge. This appeal concerns whether Plaintiff-Appellant Kenneth Adkins was entitled to an adverse inference instruction because video and photographic evidence relating to his 42 U.S.C. § 1983 excessive force claim against Defendant-Appellee Basil Wolever was lost by Ionia Maximum Correctional Facility ("IMAX"), the prison where Adkins was housed and where Wolever was employed. The district court initially denied Adkins's request for an adverse inference instruction,

applying Michigan law as required by Sixth Circuit precedent at that time. The case proceeded to trial, where a jury returned a verdict in favor of Wolever. Adkins appealed the denial of the spoliation sanction, and a panel of this court affirmed. We reheard Adkins's appeal en banc to determine whether a spoliation sanction should be governed by federal law or state law. The en banc court joined our sister circuits in holding that federal courts are not constrained by state law when crafting proper spoliation sanctions, and, accordingly, remanded the case back to the district court for reconsideration of Adkins's adverse inference instruction request and request for a new trial in light of federal law on spoliation sanctions. After holding an evidentiary hearing, the district court concluded that Adkins was not entitled to such an inference and denied his request for a new trial. Adkins again timely appealed. For the following reasons, we **AFFIRM**.

I.

> Kenneth Ray Adkins, a state prisoner in Michigan, sued corrections officer Basil Wolever in federal court under 42 U.S.C. § 1983, alleging that Wolever assaulted Adkins in his cell by yanking his hands through a slot in the cell door before removing his handcuffs. Before Adkins filed his lawsuit, an inspector at the prison reviewed color Polaroid photographs of Adkins's injuries and stationary video footage of the area where the alleged assault occurred. During discovery, Adkins asked Wolever to produce any photographs and video footage related to the assault. Prison officials could not locate this video footage or the color photographs, which had been lost or destroyed.[1] Because Wolever produced only black and white copies of the original photographs and did not produce the video footage, Adkins asked the trial court to instruct the jury that it could presume that the missing video and color photographic evidence would be favorable to Adkins. The district court applied state law and denied the request because Michigan's spoliation instruction required Adkins to demonstrate that the spoliated evidence was under Wolever's control, which it undisputedly was not. The original panel affirmed that ruling. *Adkins* [*v. Wolever*], 520 F.3d [585,] 587 [(6th Cir. 2008) (*Adkins I*)] (citing *Beck* [*v. Haik*], 377 F.3d [624,] 641 [(6th Cir. 2004)]).

*Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009) (en banc) (*Adkins II*).

---

[1]The missing video evidence also included a videocassette containing post-incident narrative interviews with IMAX employees.

The original panel urged the court to rehear the case en banc to reconsider whether spoliation sanctions should be governed by federal law or state law, *see Adkins I*, 520 F.3d at 588, and the full court obliged. The en banc court reversed the panel and joined our sister circuits in concluding that federal law, rather than state law, governs spoliation sanctions during litigation in federal courts. *Adkins II*, 554 F.3d at 652. Accordingly, the court remanded the case to the district court for reconsideration of Adkins's request for a spoliation sanction, noting that "we leave to the district court the exercise of its broad discretion to decide if Wolever should be subject to any form of spoliation sanctions despite the fact that he was not the prison records custodian." *Id.* at 653.

On remand, the district court allowed the parties to conduct more discovery and held an evidentiary hearing. At the evidentiary hearing, the parties stipulated that a surveillance video existed, was downloaded to a disc, and was viewed by at least one person—former custody inspector Matt Macauley.[2] Adkins then called four witnesses. The first witness, Jamie Canfield, a housing unit officer at IMAX—a position similar to Wolever's—testified that he had no idea where IMAX retained evidence, records, videos, etc. Adkins also called John Spurgis, the hearing officer who conducted Adkins's prisoner misconduct hearing. Spurgis testified that while Adkins requested the surveillance video, Spurgis denied the request as irrelevant because the video was not positioned to show the inside of the cell or whether Adkins destroyed the sprinkler head, which was the misconduct in question.

Much of the evidentiary hearing testimony came from two witnesses—Erica Huss, an assistant deputy warden, and Macauley. Huss testified that the prison had a retention policy for records like videos and photographs. The policy required IMAX to keep these items for three years unless there was pending litigation, in which case they should be kept until the conclusion of that litigation. According to Huss, while officers like Wolever normally do not have access to a copy of the retention policy, they could

---

[2]Most of the testimony at the evidentiary hearing and the bulk of the argument in the parties' briefs focuses on the surveillance video. This recitation of facts, thus, focuses solely on the surveillance video, which is the most relevant aspect of this appeal.

probably request it. The prison also had a litigation coordinator who helped with discovery requests and acted as a liaison for employees at the prison. The litigation coordinator had full access to records maintained by the prison and could make copies.

The IMAX computers that record surveillance video only have enough memory to record for ten days; after that, the computers record over the oldest footage, which is then lost unless someone had downloaded it. To download a surveillance video, a person would have to enter a separate room, which required special access codes, where a special computer was set up to burn the video onto a disk. Operation of this equipment required specific training that officers like Wolever lack. Moreover, a special program is required in order to view the video once it is burned to the disk; the surveillance video disk will not play on standard computer media player software.

Huss testified that Adkins could have requested to view the surveillance video but that his request would most likely have been denied because having a prisoner know what areas the surveillance cameras cover would create a security concern. Wolever would not have been allowed to download the surveillance video, Huss noted, and would have no access to where the video was kept. If an investigation was pending, Wolever would not have been able to get a copy of the video until the conclusion of the investigation, in which case the video would be part of his disciplinary packet if he was disciplined. No copies of the disk were made because Wolever was not disciplined for the incident.

Huss claimed to have no idea what happened to the surveillance video and could not remember if she viewed it. Huss testified that Wolever had no practical control over the video, that he would expect the retention policy to cover the items, and that the preservation policy would have been beyond his control. Although Huss stated that Wolever could not get a copy of the video because he was not disciplined, when asked whether he could receive a copy instant to litigation she replied, "[N]ot sure, possibly."

The final witness at the evidentiary hearing was Macauley, the former custody inspector at IMAX who investigated Adkins's charges of assault and had custody of the

surveillance video. Macauley downloaded the surveillance video on a disk as part of his investigation, which included interviewing Adkins and Wolever. He then stored the disk on a shelf in his office for a year. Macauley's office was in a high security area where few people, of whom Wolever was not one, had access. After a year, the disk should have been moved from Macauley's office to the retention area nearby but still within the secure area. Macauley testified that he did not know what happened to the disk with the surveillance video because he left IMAX in 2003, but he thought it probably went missing during the transition after his departure.

According to Macauley, Wolever would not have had access to the video stored in his office. Macauley testified that Wolever never had care, custody, or control of the video and that Wolever could expect IMAX to maintain records per the retention policy. Macauley even said that Wolever could not have received a copy of the video had he asked because of litigation. Macauley was only authorized to release the video to the litigation coordinator, meaning Wolever's request would have to go through that person.

Macauley testified that he and Huss viewed the surveillance video. When asked what he viewed on the video, Macauley described the scene as follows:

> The view was partially blocked. It was of help to my decision in the investigation by watching the reaction of the other staff on the tape. There was a mass shakedown going on and there was no reaction by the staff in the area.

> But the direct view, because this is looking at a very large area over a wide scape so it's not very— it's not crystal clear, there were two female staff who had just exited a cell after they went down and they were standing at the rail talking I presume about what contraband they had discovered or what they were going to do as far as searching the cell they were in, so I could not directly see the removal of the restraint process.

> But I could see the other four or five staff on both rocks, upper and lower, who just were conducting business as normal so that's how I came to my conclusion that I did not see anything out of the norm in my investigation.

For his part, Wolever testified that he had no role in maintaining the surveillance video and that he had no control over it. Although Wolever admitted in a Rule 34 admission that he had the practical ability to obtain prison records for litigation purposes, he also admitted that he assumed the retention policies would be followed by IMAX.

Considering this evidence, the district court determined that a spoliation sanction was not warranted and that Adkins was not entitled to a new trial or other form of relief. Adkins again timely appealed.

## II.

District courts have broad discretion to craft proper sanctions for the spoliation of evidence. *Adkins II*, 554 F.3d at 652. Accordingly, we review the district court's decision not to impose a spoliation sanction under the abuse of discretion standard, "[g]iving great deference to the district court's credibility determinations and findings of fact." *Beaven v. United States Dep't of Justice*, 622 F.3d 540, 553, 554 (6th Cir. 2010). "A court abuses its discretion when it commits a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact." *Jones v. Ill. Cent. R. Co.*, 617 F.3d 843, 850 (6th Cir. 2010) (quoting *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 623 (6th Cir. 2008)).

In *Beaven*, we explained that the standard for determining whether a particular spoliation sanction is appropriate is as follows:

> A party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; *and* (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. Thus, an adverse inference for evidence spoliation is appropriate if the Defendants knew the evidence was relevant to some issue at trial and their culpable conduct resulted in its loss or destruction. This depends on the alleged spoliator's mental state regarding any obligation to preserve evidence and the subsequent destruction.

622 F.3d at 553-54 (quotation marks and citations omitted) (emphasis added).  We also described the purpose of a spoliation sanction:

> When appropriate, a proper spoliation sanction should serve both fairness and punitive functions, but its severity should correspond to the district court's finding after a fact-intensive inquiry into a party's degree of fault under the circumstances, including the recognition that a party's degree of fault may range from innocence through the degrees of negligence to intentionality.  Thus, a district court could impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence.

*Id*. at 554  (quotation marks and citations omitted).

The district court concluded that Adkins had not established the requirements for a sanction because the preservation of the evidence "was entirely beyond Officer Wolever's control."  The test prescribed in *Beaven* is conjunctive; thus, so long as the district court did not err in determining that Adkins had not satisfied at least one of the prongs, its determination that a spoliation sanction was not warranted should not be upset.  As to the surveillance video, that prong is the second one—whether the records were destroyed with a culpable state of mind.[3]

To warrant a spoliation sanction, the party seeking the sanction must show that the evidence was destroyed with a culpable state of mind.  This factor is satisfied "by a showing that the evidence was destroyed knowingly, even if without intent to breach a

---

[3]This opinion, like the parties' briefs, focuses predominantly on the destruction of the surveillance video.  We affirm the district court's decision not to impose a spoliation sanction with regard to the witness narrative video and the color photographs because the district court did not err in concluding that Adkins had not satisfied the third prong of the *Beaven* test as to those items, i.e., whether they were relevant to his claims.  The district court found that Adkins had not developed the substance of the witness statements video by introducing depositions or affidavits explaining its contents; thus, it found no evidentiary basis that the video would support Adkins's claim.  As to the color photographs, the district court noted that the black and white copies Wolever produced were of poor quality, but it rejected Adkins's argument that the originals or color copies would have made a difference in the trial.  The district court concluded that color copies would have been cumulative evidence that would have only provided a better depiction of the discoloration on Adkins's arms without aiding the jury in determining the cause of those injuries.  Moreover, during his testimony at trial, Adkins provided a vivid description of his injuries: "My arms were cut up, scratched up and stuff, and I had a big old gash where there was just the inside of my arm, guts and fat just in my arms, it was sticking out.  It was swelled up about an inch high and was sticking out."  Neither determination by the district court was clearly erroneous in light of the evidence presented; thus, the district court did not abuse its discretion in denying Adkins a spoliation sanction as to these items.

duty to preserve it, or negligently." *Id.* (emphasis omitted). The district court concluded that "[i]n the absence of any evidence that Wolever had control or access over these items, there is no basis to assert that Wolever had any culpability for the loss of the items." Because the record does not indicate that the district court clearly erred in determining that Wolever had no culpability for the loss of the surveillance video, we affirm.

Adkins avers that the district court erred in not finding culpability because Wolever had a duty to preserve the evidence and, thus, should have taken affirmative steps to ensure that IMAX maintained the surveillance video. Conceding that negligence is sufficient to find culpability, Wolever denies that his conduct constituted negligence. Wolever insists that any burden he had was met because the prison's retention policy required it to maintain the records. Pointing to Huss's testimony that Wolever could expect the prison to preserve the evidence, Wolever claims that his reliance was reasonable and, therefore, not negligent.

Adkins insists that a sanction is proper even though Wolever was not personally responsible for the destruction of the evidence, and he cites several cases from around the country for this proposition. *See Silvestri v. General Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001); *King v. Am. Power Conversion Corp.*, 181 F. App'x 373, 377 (4th Cir. 2006); *Jain v. Memphis Shelby Co. Airport Auth.*, 2010 WL 711328, at *3 (W.D. Tenn. Feb. 25, 2010); *Alexander v. Del Monte Corp.*, 2011 WL 134061, at *1 (E.D. Mich. Jan. 11, 2011); *Erie Ins. Exch. v. Davenport Insulation, Inc.*, 659 F. Supp. 2d 701, 706, 708 (D. Md. 2009); *Paul Revere Life Ins. Co. v. Jafari*, 2002 WL 34367714, at *5-6 (D. Md. Sept. 19, 2002). Adkins also directs our attention to several instances in which district courts granted adverse inference instructions in circumstances similar to this one. *See Kounelis v. Sherrer*, 529 F. Supp. 2d 503 (D. N.J. 2008) (permitting an adverse inference instruction against a defendant because surveillance video evidence of an alleged assault by prison guards was lost because it was never downloaded and recorded onto a videotape); *LaJoices v. City of North Las Vegas*, 2011 WL 1630331 (D. Nev. April 28, 2011) (permitting adverse inference instruction against

defendants where surveillance video and photographs of alleged prison assault were lost); *Peschel v. City of Missoula*, 664 F. Supp. 2d 1137 (D. Mont. 2009) (granting spoliation sanction of default judgment against defendants because dashboard video of the arrest at the core of the claim was lost after being uploaded to a police department computer and viewed by several officers).

Wolever responds that many of the cases Adkins cites are distinguishable from this case because they involve situations where the sanctioned party had access or control of the evidence before it was given to the third party that destroyed it, *see Alexander*; *Erie Ins. Exch.*; *Cyntegra*, or situations where the lost item was integral to the underlying claim, *see King*; *Paul Revere*. Distinguishable or not, the cases Adkins cites are not binding precedent requiring the district court to impose a spoliation sanction in this instance. Instead, they are relevant to why the district court could have granted Adkins's request for an adverse inference instruction only to the extent we find them persuasive. While the district court could have followed other district courts and found Wolever culpable even though the prison, not Wolever, lost the evidence, the case law supporting such a finding does not *require* the court to find that level of negligence. The ultimate determination of culpability is within the district court's discretion so long as it is not a clearly erroneous interpretation of the facts.

The district court reviewed the evidence and concluded that Wolever was not culpable because he had no control over the evidence. This conclusion was not clearly erroneous. The evidentiary hearing produced testimony that evidence used in internal investigations would be preserved and that Wolever could rely on IMAX to maintain the evidence per its policy. Other testimony showed that Wolever could only access the evidence through the litigation coordinator and that the surveillance video might already have been lost when Wolever was served with Adkins's complaint in January 2004. Even if we were to disagree with the district court's ultimate conclusion on culpability, it does not necessarily follow that the district court's determination should be upset. Although the district court's decision runs counter to the holdings of some other courts, the evidence in the record provides a basis for the district court's conclusion that

Wolever was not culpable. "[A] fact-intensive inquiry into [Wolever's] degree of fault under the circumstances" could reasonably generate the conclusion that Wolever was innocent of any destruction or loss. *Beaven*, 622 F.3d at 554.

Moreover, the nature of this case—an issue involving internal prison procedures on evidence retention—cautions against stringently second-guessing the district court's determination. The Supreme Court has stated, albeit in a slightly different context, that "courts . . . owe substantial deference to the professional judgment of prison administrators." *Beard v. Banks*, 548 U.S. 521, 522 (2006). A similar concern colors our review of this case. Adkins avers that the "failure to impose a spoliation sanction against Wolever opens the door for IMAX and other prisons to destroy evidence in all prisoner rights cases" because the prison itself is not subject to suit under the Eleventh Amendment, thus it would have an incentive to destroy evidence that is damaging to its employee's case. This is a justifiable concern.

At the same time, to hold that all defendants in situations like Wolever's must take affirmative steps to ensure that their employing prison continues to maintain evidentiary records for every incident with a prisoner would impose an added burden on prison employees. As Adkins noted in his brief, "given prisoners' penchant for litigation, Wolever (and IMAX) should have foreseen future litigation." To impose a rule to cover every such situation would unnecessarily interrupt a prison administrators' judgment as to how to operate their prisons and force prison employees to constantly second-guess their employer's ability to maintain potential evidence for possible litigation. That is not a burden we are willing to impose.

The more prudent path, and the one we adopt today, is to consider incidences raising spoliation questions on a case-by-case basis, considering the purposes of a spoliation sanction and the factors for determining whether one should be imposed. That function rests within the broad discretion of the district courts, and to adopt a bright-line rule like Adkins requests would infringe upon that discretion as well as the ability of prison administrators to manage their institutions. That a spoliation sanction was not imposed in this instance does not mean that prisons have carte blanche to destroy any

evidence that would be beneficial to prisoners' civil rights complaints; a survey of the jurisprudence of other district courts within this circuit and across the country demonstrates as much. Instead, we leave the determination of the propriety of a spoliation sanction to the discretion of the district court, considering the facts of each case individually, and we will not upset a district court's determination unless it constitutes an abuse of discretion.

## III.

The district court did not abuse its discretion in denying Adkins's request for a spoliation sanction. Therefore, we affirm.