*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0119p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

ERNEST FLAGG, as Next Friend of J.B., a
minor; TARIS JACKSON, as Next Friend of
A.J., a minor; and DR. BRIAN GREENE, as
Next Friend of I.B., a minor,
>    *Plaintiffs-Appellants*,

v.

CITY OF DETROIT, a municipal corporation;
and KWAME M. KILPATRICK, jointly and
severally,
>    *Defendants-Appellees*.

No. 11-2501

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:05-CV-74253—Gerald E. Rosen, Chief District Judge.

Argued: November 27, 2012

Decided and Filed:  April 25, 2013

Before:  SILER, COLE, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Norman A. Yatooma, NORMAN YATOOMA & ASSOCIATES, P.C.,
Bloomfield Hills, Michigan, for Appellants.  Linda D. Fegins, CITY OF DETROIT
LAW DEPARTMENT, Detroit, Michigan, for Appellee City of Detroit.  Michael C.
Naughton, THOMAS & NAUGHTON, P.C., Detroit, Michigan, for Appellee Kilpatrick.
**ON BRIEF:** Norman A. Yatooma, Howard Yale Lederman, NORMAN YATOOMA
& ASSOCIATES, P.C., Bloomfield Hills, Michigan, for Appellants.  John A. Schapka,
CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellee City of
Detroit.  Michael C. Naughton, James C. Thomas, THOMAS & NAUGHTON, P.C.,
Detroit, Michigan, for Appellee Kilpatrick.

_____

**OPINION**

_____

COLE, Circuit Judge.    Plaintiffs-Appellants J.B., A.J., and I.B., the minor children of Tamara Greene, appeal the district court's grant of summary judgment in favor of Defendants-Appellees Kwame Kilpatrick and City of Detroit on Plaintiffs' § 1983 claims of conspiracy to deny and denial of access to the courts.   Plaintiffs claim that Defendants denied them access to the courts by obstructing the investigation of their mother's death, thereby preventing Plaintiffs from obtaining a remedy in state court. Plaintiffs appeal: (1) the district court's decision to exclude evidence of the firing of former Deputy Chief Brown and Defendants' alleged interference with an investigation by the State of Michigan; (2) a grant of summary judgment in favor of Defendant Kilpatrick; (3) a grant of summary judgment in favor of the City of Detroit; and (4) the district court's sanctioning the City of Detroit with a permissive adverse inference instruction instead of a mandatory adverse inference instruction.   We affirm the judgment of the district court.

I.

A.

Plaintiffs allege that, in or around fall of 2002, then-Mayor Kwame Kilpatrick and several members of his Executive Protection Unit (EPU) were present at a party at the Manoogian Mansion, Detroit's mayoral residence.   It was rumored that Tamara Greene performed at this party as an exotic dancer, and that Carlita Kilpatrick, Kwame Kilpatrick's wife, arrived at the party unexpectedly and assaulted Greene.

On April 30, 2003, at approximately 3:40 a.m., Tamara Greene was shot to death in her car.   The morning after the shooting, Sergeant Marian Stevenson of Detroit Police Department (DPD) Homicide Squad 8, one of the officers who had answered the initial call to the scene, was chosen to lead the murder investigation.   According to Stevenson, the "talk through Homicide" that day was that "there was a connection between the death

of Tammy Greene and the incident at the [Manoogian] mansion." Other officers told Stevenson they would not "want to be [her]," that they would not want to work with her on the case, or even "walk side by side with" her because she "might get shot like Tammy." As Stevenson pursued the investigation, circumstantial evidence arguably consistent with, but at best vaguely indicating, a coverup began to emerge.

According to Plaintiffs' witnesses, the Greene investigation, as well as the possibility of a link between Greene and the alleged party, aroused the interest of DPD officers. On May 21, 2003, an anonymous caller to DPD linked Greene to the party. The next day, Commander Fred Campbell of the DPD's Central Services Bureau, who was three levels above Stevenson in the chain of command, met with Stevenson and Lieutenant Billy Jackson, who headed Squad 8 until his promotion in the fall of 2003, to discuss the investigation. Campbell also briefed several DPD superiors. As the investigation proceeded, then-Chief of Police Jerry Oliver allegedly requested the investigative file "numerous" times, after which file items went missing on multiple occasions.

Stevenson discovered that case notes concerning the Greene murder investigation had been erased from her computer hard drive, and that four floppy disks containing investigation materials had been taken from a locked case on her desk. Stevenson later realized that additional materials were missing from the Greene file, including a spiral notebook in which Stevenson recorded her investigative activities and handwritten notes from witness interviews. Also missing was a videotape of Greene's funeral, which purportedly showed "a couple" of police officers from DPD Homicide and two members of the EPU in attendance.

On March 10, 2004, after ongoing discussions within DPD of potential links between Greene and the rumored party at the mayoral residence, Chief of Police Ella Bully-Cummings approved the reassignment of the Greene case to the DPD Cold Case squad. According to Squad 8 Lieutenant Alvin Bowman, Bully-Cummings said that she wanted the Greene file "put away in a safe place" and that the case was not to be discussed "outside of this room." According to Jackson and Stevenson, cases usually

were not sent to the Cold Case squad as quickly as Greene's, with most being transferred at least one and a half to two years after the commencement of an investigation. Sergeant Odell Godbold of the Cold Case Squad, one of the three squad members assigned to the Greene investigation, testified that the usual practice was to transfer cases after at least two years from the opening of the initial file, that he had never received a case less than two years old, and the squad's federal funding was conditioned on a requirement that the transferred cases be at least two years old.

Stevenson testified that she had never had a homicide investigation "taken" from her, and was on the verge of pursuing leads that would have led her to question members of Kilpatrick's EPU and staff. Shortly after the transfer of the Greene investigation, Stevenson, Bowman and Jackson were allegedly transferred to inferior positions within DPD without credible explanation. Also, Stevenson testified that after her transfer, among other things, her house was broken into twice and she repeatedly observed DPD officers near her residence. These incidents caused Stevenson to be concerned for her safety and motivated her to move out of the precinct.

According to Godbold, the Cold Case squad initially perceived no limits on its ability to conduct its investigation. Godbold claims he initially believed that Greene's friend and passenger on the night of the shooting, Eric Mitchell, was the shooter's real target, and that is why he ignored evidence that led back to Greene's performance at the alleged party.

Beginning in late 2004, Godbold's investigation into Greene's murder began to run into obstacles, including Godbold's reassignment to a building that did not house the case file and the disappearance of a cell phone recovered from the murder scene. Godbold testified that he was permitted to continue the Greene investigation for a few months, until Assistant Chief of Police Walter Martin discovered that Godbold had shown the Greene file to the head of DPD's Major Crimes division at his request. According to Godbold, after that, Martin took the file away from him. In August 2005, Godbold arrived at work to find the Cold Case squad shut down. Godbold was

assigned—by whom, he did not know—to a non-leadership role in Squad 6, a demotion practically, if not officially, which contributed to his decision to retire in 2006.

After retirement, Godbold claims to have learned that potentially helpful tips were concealed from him while he was investigating Greene's death. At that time, Crime Stoppers, an organization that gathers anonymous tips in an effort to solve crimes, faxed a number of tips regarding Greene's murder to DPD. Godbold claims he never received those tips. After retiring, Godbold worked at Crime Stoppers and re-sent the tips to DPD. He claims that the file produced by DPD in discovery in this case only contained "some of them."

In late 2005, around the time the present suit was filed, Martin had the Greene file delivered to the Wayne County prosecutor's office. The case was not returned to DPD until December 2007, when a reconstituted Cold Case unit headed by Sergeant Michael Russell took charge of it. Russell actively investigated the Greene case from December 2007 to September 2008. During this time, Russell did not investigate the claim of a party at the Manoogian Mansion at which Greene danced because he felt there was no evidence connecting any such party to the shooting.

From September 2008 until spring or early summer 2010, the Greene investigation was inactive, due, according to Russell, to the absence of new evidence or witnesses. In 2010, the case was forwarded to the Violent Crimes Task Force for review. The task force made little progress. To date, Greene's murder has not been solved and the investigation appears to be inactive.

In addition to deficiencies in DPD's investigation of Greene's murder, Plaintiffs cite certain DPD promotions as evidence of Kilpatrick's desire to stall the DPD investigation. They claim Kilpatrick appointed Bully-Cummings as Chief of Police with the expectation that she would be loyal to him, citing Bully-Cummings's past assistance to Carlita Kilpatrick with obtaining a city vehicle and the text messages wherein Bully-Cummings appeared to be colluding with Kilpatrick on matters related to Brown's removal. Plaintiffs suggested that Lieutenant Brian Stair was promoted to head of the DPD's Internal Affairs section as a reward for allegedly sharing a memorandum by

Brown—which discussed allegations against Kilpatrick's EPU as well as the alleged party—with Kilpatrick and his chief of staff, Christine Beatty. Plaintiffs also cited Godbold's suspicions that Lieutenant Tolbert, Deputy Police Chief Saunders, and Assistant Police Chief Martin were promoted in exchange for hindering the Greene murder investigation.

B.

On November 7, 2005, Plaintiffs, the three minor children of Tamara Greene, filed this lawsuit. The Third Amended Complaint, filed on September 5, 2008, names Kwame Kilpatrick and the City of Detroit (City), among others, as defendants and alleges two counts against each claiming denial of access to the courts under 42 U.S.C. § 1983. Count I alleges that Kilpatrick and the City deprived Plaintiffs of their right of access to the courts by obstructing the investigation of Greene's death and thereby depriving Plaintiffs of the ability to recover damages in a state court wrongful death action against Greene's killer. Plaintiffs allege that the applicable statutes of limitation had expired and Defendants' actions "rendered Ms. Greene's homicide unsolvable." Count II alleges that Defendants conspired to deny Plaintiffs their right of access to the courts. The other defendants—DPD officers and Beatty—were voluntarily dismissed from the suit.

As part of the extensive discovery in this case, Plaintiffs filed a motion for preservation of evidence on February 1, 2008. Among other things, the motion identified "[copies] of any and all records of incoming and outgoing emails, including the actual emails . . . originating from or received by [Kwame Kilpatrick, Ella Bully-Cummings, Christine Beatty, Mike Martin, Loronzo Jones and others, not including the City's corporate counsel Ruth Carter]." The request was limited to emails beginning on September 1, 2002, and continuing past June 30, 2003. On March 5, 2008, the district court entered an order granting Plaintiffs' motion and directing Defendants to "take all necessary and appropriate steps to preserve the materials identified."

On July 30, 2010, Plaintiffs requested discovery of "[a]ll incoming and outgoing emails for Kwame Kilpatrick, Ella Bully-Cummings, Christine Beatty, Ruth Carter,

Mike Martin, and Loronzo Jones for all City of Detroit e-mail addresses in use for City employees for the time period of August 1, 2002 through June 30, 2003." After Plaintiffs filed a followup motion to compel discovery, the City responded that "[u]pon their resignations during February of 2008, Beatty and Kilpatrick's email accounts and collected emails . . . were deleted and purged from the electronic storage system."

The district court concluded, and the City does not dispute on appeal, that the City "clearly acted culpably and in bad faith" in destroying emails sent and received by Kilpatrick, Beatty, Carter and Bully-Cummings. The district court denied Plaintiffs' motion for default judgment, but granted Plaintiffs' request for a permissive adverse inference instruction as to the emails in question, to be directed at Defendant City of Detroit only. The district court rejected Plaintiffs' arguments for a harsher sanction, such as default judgment or a mandatory adverse inference instruction.

As of September 2010, only Kilpatrick and the City remained as defendants. Kilpatrick and the City filed motions for summary judgment, which the district court granted. In the same order, the district court excluded two significant categories of evidence as inadmissible propensity evidence under Federal Rule of Evidence 404: evidence regarding Defendants' alleged actions (1) causing Deputy Chief Gary Brown and Officer Harold Nelthrope's departures from the DPD; and (2) interfering with the State of Michigan's investigation into the alleged party, Brown's firing and alleged misconduct by the EPU.

## II.

Plaintiffs appeal both grants of summary judgment, as well as the district court's decision to exclude the aforementioned evidence. Plaintiffs also appeal the district court's decision to sanction the City's spoliation of evidence during trial with a permissive adverse inference instruction, rather than a mandatory, non-rebuttable, inference instruction.

A.

The Supreme Court has recognized a constitutional right of access to the courts, whereby a plaintiff with a nonfrivolous legal claim has the right to bring that claim to a court of law. *See Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002) (collecting cases). Plaintiffs' denial of access claims here involve three components, only one of which is substantive. First, 42 U.S.C. § 1983 permits individuals to bring suit against a state actor who deprives them of a federal right, either constitutional or statutory, without due process of law. *Ziegler v. Aukerman*, 512 F.3d 777, 781 (6th Cir. 2008). Section 1983 creates no substantive rights, but "merely provides remedies for deprivations of rights established elsewhere." *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000) (citation omitted). Neither does the right to access the courts; a denial-of-access plaintiff must have an arguable, nonfrivolous underlying cause of action. *See Christopher*, 536 U.S. at 415 (right of access is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury"). Plaintiffs claim that Defendants deprived them of their constitutional right (§ 1983 component) to access the courts (denial of access component) to bring a claim of wrongful death (underlying substantive component) against their mother's shooter(s).

Denial of access to the courts claims may be "forward-looking" or "backward-looking." *See id.* at 415. In forward-looking claims, the plaintiff accuses the government of creating or maintaining some "frustrating condition," that stands between the plaintiff and "the courthouse door." *Id.* at 413. The object of the suit is to eliminate the condition, thereby allowing the plaintiff, usually an inmate, *see Pena v. Mattox*, 84 F.3d 894, 902 (7th Cir. 1996), to sue on some underlying legal claim. *See Christopher*, 536 U.S. at 413 (collecting cases). In backward-looking claims, such as those at issue in the instant case, the government is accused of barring the courthouse door by concealing or destroying evidence so that the plaintiff is unable to ever obtain an adequate remedy on the underlying claim. *See id.* at 413-14. Backward-looking claims are much less established than forward-looking claims, *see Sousa v. Marquez*, 702 F.3d 124, 127-28 (2d Cir. 2012) (pointedly assuming *arguendo*, instead of holding, that

backward-looking claims are cognizable at all), but this Court has recognized them and the Supreme Court has provided additional guidance as to the elements of a viable backward-looking claim.

In *Swekel v. City of River Rouge*, 119 F.3d 1259 (6th Cir. 1997), Dolores Swekel claimed that local police denied her access to the courts by covering up the identity of one of two drivers who hit and killed her husband. *Id.* at 1260. Swekel successfully sued the other driver for her husband's wrongful death, but claimed the coverup prevented her from suing the second driver, a high-ranking police officer's son, whose identity she did not find out until after the state statute of limitations had run and she had already sued for denial-of-access. *Id.* at 1261. We agreed that the alleged coverup "would [have] substantially prejudice[d]" Swekel's ability to recover in state court, but ultimately affirmed the dismissal of Swekel's claim because she failed to either "attempt[] to go to the state court" or present evidence that it would be futile to do so because the state court would be unable to adequately address the prejudice caused by the coverup. *See id.* at 1264, 1264 n.2.

In *Christopher*, the Supreme Court held that a backward-looking denial of access claim requires the plaintiff to identify "an underlying cause of action for relief that the plaintiff would have raised had it not been for the deception alleged," 536 U.S. at 405, and to seek relief that would be unavailable otherwise. *Id.* at 406. Jennifer Harbury sued several federal agencies and their individual members for concealing her husband's death after a Guatemalan colonel and paid agent of the CIA ordered his killing. *Id.* at 407-08. The "basic theory" of her denial of access claim was that if the officials had not "affirmatively misl[ed her] into thinking they were doing something," she would have "take[n] appropriate actions to save her husband's life," such as seeking emergency injunctive relief. *See id.* at 409-10, 419.

In *Christopher*, the Supreme Court assumed without deciding the correctness of *Swekel* and other decisions recognizing backwards-looking claims. *Id.* at 414 n.9. The Court held that Harbury failed to state a valid denial of access claim because her complaint "failed to identify the underlying cause of action that the alleged deception

had compromised, going no further than the protean allegation that [Defendants'] false and deceptive information and concealment foreclosed Plaintiff from effectively seeking adequate legal redress." *Id.* at 418 (internal quotation marks omitted). The Court ultimately held that, even if Harbury had identified a viable underlying claim, her denial of access claim would have failed because the court could not provide her with the remedy she claimed to have lost, an injunction to save her husband's life. *See id.* at 421-22.

*Swekel* and *Christopher* permit us to enumerate the elements of a backward-looking denial of access claim: (1) a non-frivolous underlying claim, *see id.* at 415 (citing *Lewis v. Casey*, 518 U.S. 343, 353 and n.3 (1996)); (2) obstructive actions by state actors, *see Swekel*, 119 F.3d at 1262-63 (discussing cases); (3) "substantial[] prejudice" to the underlying claim that cannot be remedied by the state court, *see id.* at 1264; and (4) a request for relief which the plaintiff would have sought on the underlying claim and is now otherwise unattainable, *see Christopher*, 536 U.S. at 421-22. Plaintiffs must make out the denial-of-access elements against each defendant in conformance with the requirements of § 1983.

Under § 1983, there is no *respondeat superior* or vicarious liability. *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 122 (1992). When suing an individual actor, such as Kilpatrick, for constitutional violations under § 1983, a plaintiff must demonstrate that the actor "directly participated" in the alleged misconduct, at least by encouraging, implicitly authorizing, approving or knowingly acquiescing in the misconduct, if not carrying it out himself. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). To prove acquiescence, it is not enough to show that the actor merely failed to act against misconduct of which he was aware. *See id; Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988).

When suing a municipality, such as the City, for constitutional violations under § 1983, a plaintiff must prove that the deprivation occurred pursuant to a municipal "policy or custom." *See Meyers v. City of Cincinnati*, 14 F.3d 1115, 1117 (6th Cir. 1994). A single decision can constitute a policy, if that decision is made by an official

who "possesses final authority to establish municipal policy with respect to the action ordered," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986), which means that his decisions are "final and unreviewable and are not constrained by the official policies of superior officials." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 814 (6th Cir. 2005) (internal quotation marks omitted).

B.

Plaintiffs seek the admission of the two disputed categories of evidence to make out the second element—obstruction—by bolstering their "reasonabl[e] infer[ence]" that Kilpatrick implemented a policy "of preventing any real investigation into the Manoogian Mansion party or Greene's homicide." First, the district court excluded evidence regarding Kilpatrick and the City's alleged past retaliation against DPD officers who investigated Kilpatrick and his EPU. On June 2, 2003, Deputy Chief Gary Brown, former head of the DPD's Professional Accountability Bureau (PAB), and Officer Harold Nelthrope, a former member of Kilpatrick's EPU, filed a whistleblower suit in Wayne County Circuit Court in Michigan. Brown and Nelthrope alleged that DPD and others had retaliated against them for investigating the behavior of Kilpatrick and the EPU. A jury awarded them a total of $6.5 million in damages. Brown and Nelthrope ultimately settled with the City and Kilpatrick. Second, the district court excluded evidence that Kilpatrick and the City allegedly interfered with the State of Michigan's investigation into Brown's firing, the alleged party and purported EPU misconduct. These allegations were supported by, among other things, a number of text messages between Kilpatrick and other City officials and testimony from MSP investigators. *See Flagg v. City of Detroit*, 827 F. Supp. 2d 765, 786-91 (E.D. Mich. 2011) (providing detailed narratives on both topics).

The district court held that Federal Rule of Evidence 404(b) barred Plaintiffs from introducing evidence on either subject. On appeal, Plaintiffs argue in the alternative that (1) Rule 404(b) does not apply because the evidence is admissible as an "intrinsic act"; or (2) the evidence was admissible under Rule 404(b). We review the district court's decision to exclude the evidence under an abuse-of-discretion standard.

*See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997) (citations omitted). An abuse of discretion exists only if the Court is "firmly convinced that the district court has made a mistake." *United States v. Logan*, 250 F.3d 350, 366 (6th Cir. 2001) (citation omitted). This standard of review is "deferential" because a trial judge has "broad discretion on evidentiary rulings." *United States v. Hart*, 70 F.3d 854, 858 (6th Cir. 1995) (internal quotation marks omitted).

Rule 404(b) bars the admission of "propensity evidence," defined as "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, it permits the admission of prior "bad acts" for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

Rule 404(b) does not apply to evidence that is "intrinsic to" or "inextricably intertwined with evidence of" the central alleged wrong. *See United States v. Henderson*, 626 F.3d 326, 338 (6th Cir. 2010) (citations omitted). Intrinsic acts are "part of a single [] episode" or "a continuing pattern of illegal activity" that includes the central alleged offense. *See United States v. Gonzalez*, 501 F.3d 630, 639 (6th Cir. 2007) (quoting *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995)). This Court has also described intrinsic acts as "background evidence" that "has a causal, temporal or spatial connection with the charged offense . . .[,] is a prelude to the [central allegation], is directly probative of the [central allegation], arises from the same events as the [central allegation], forms an integral part of a witness's testimony, or completes the story of the [central allegation]." *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000) (citation omitted).

One could construct plausible arguments that the excluded evidence is intrinsic to the denial of access allegations central to this case, but Plaintiffs do not do so. We note that the district court's analysis dwells unduly on the point that Brown's firing and the interference with the State's investigation were not done specifically in furtherance of denying Plaintiffs access to the courts. Even without such specific intent, there may

still be a causal connection between events.  However, any connection between the excluded evidence and the Greene investigation is highly speculative.  Accordingly, Plaintiffs fail to "firmly convince[]" us that the district court abused its discretion in finding the excluded evidence to be extrinsic and applying Rule 404(b).

Where Rule 404(b) applies, there are three steps to determining admissibility. First, the court must determine whether there is sufficient evidence for a reasonable jury to find that the prior act(s) in question took place.  *See United States v. Clay*, 667 F.3d 689, 699 (6th Cir. 2012) (citation omitted); *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir. 1992) (en banc).  Second, it must determine whether the prior acts are admissible for a proper purpose—one other than propensity.  *See Gessa*, 971 F.2d at 1261; *Clay*, 667 F.3d at 693.  Third, it must determine whether, under the balancing determination in Rule 403, the danger of unfair prejudice substantially outweighs the probative value of the evidence.  *See Gessa*, 971 F.2d at 1262;  *United States v. Stout*, 509 F.3d 796, 799 (6th Cir. 2007); Fed. R. Evid. 403.  Assuming, without deciding, that the first element of sufficient evidence was met, we nonetheless conclude that the district court did not abuse its discretion in excluding this evidence due to lack of a proper purpose.

Plaintiffs cite several cases where "other acts" evidence was admitted in § 1983 cases, but these are inapposite.  One involved housing discrimination, where a "pattern or practice" of discrimination is a statutory element, and made no mention of Rule 404(b).  *See United States v. Balistrieri*, 981 F.2d 916, 929-30 (7th Cir. 1992).  In both of the remaining cases, prior acts were admitted to demonstrate something other than the conduct underlying the central charge.  *See Parrish v. Luckie*, 963 F.2d 201, 205-06 (8th Cir. 1992) (prior violent acts by police officer admissible to show that the city-employer knew he could be violent and engage in sexual assault); *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 572-75 (1st Cir. 1989) (prior acts were used to prove supervisory liability).  Plaintiffs do not explain how these cases are like the instant case nor do they explain how these cases should guide this Court to admit the evidence in question.

The district court rejected motive as a proper purpose for admitting the evidence regarding Brown's firing because, without a propensity inference, any proof of motive would have "extremely limited value." The Plaintiffs' argument that "[t]he jury will want to know why Kilpatrick acted as he did," is a valid reason to admit allegations that the Manoogian Mansion party occurred (since its coverup is the alleged motive for stalling the Greene murder investigation), but does not explain why evidence of Kilpatrick's interference with Brown's and the State's investigations should be admitted. Plaintiffs' observation that the City destroyed potential evidence of motive may describe grounds for sanctions, but it is irrelevant to the proper purpose analysis. The district court did not abuse its discretion by refusing to admit the evidence to prove motive.

Because the evidence was properly excluded for lack of a proper purpose under Rule 404, we need not reach the issue of whether the evidence would have violated Rule 403.

C.

Plaintiffs challenge the district court's decision to impose a permissive, as opposed to mandatory, adverse inference sanction against the City for destroying "e-mails sent and received by four former high-ranking Detroit officials, including . . . Kilpatrick, . . . Beatty, . . . Carter, and . . . Bully-Cummings, for the period from August 1, 2002 through June 30, 2003," *after* it was obligated to preserve them. *Flagg v. City of Detroit*, No. 05-74253, 2011 WL 4634245 at *1 (E.D. Mich. Oct. 5, 2011). The non-rebuttable mandatory adverse inference requested by Plaintiffs would have required the fact-finder to find that City employees, at the direction of City policymakers, *see Pembaur*, 475 U.S. at 481, intentionally interfered with or obstructed the Greene investigation.

We review the district court's decision for abuse of discretion. *See Phillips v. Cohen*, 400 F.3d 388, 396 (6th Cir. 2005) (citation omitted). Federal Rule of Civil Procedure 37(b)(2)(A) permits a district court to "render[] a default judgment" against a party who disobeys a discovery order, and the district court has "broad discretion" to permit the jury to make an adverse inference. *See Adkins v. Wolever*, 554 F.3d 650, 651

(6th Cir. 2009) (en banc); *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 554 (6th Cir. 2010).

An adverse inference is "an inference that 'the party fears [producing the evidence]; and this fear is some evidence that the circumstance or document or witness, if brought, would have exposed facts unfavorable to the party.'" *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) (quoting 2 *Wigmore on Evidence*, § 285 at 192 (Chadbourn rev. 1979)).

> "A party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."

*Beaven*, 622 F.3d at 553 (alterations and internal quotation marks omitted).

When the requirements for an adverse inference instruction are met, the district court should issue an instruction. "*[S]o long as* the district court did not err in determining that [the movant for an adverse inference instruction] had not satisfied at least one of the prongs, its determination that a spoliation sanction was not warranted should not be upset." *Adkins v. Wolever*, 692 F.3d 499, 504 (6th Cir. 2012) (emphasis added). Although the district court's findings receive deferential review, *see id.* at 506, presumably its judgment *should* be upset if the movant clearly met all three prongs and yet an instruction was not granted. However, the district court has discretion in determining the strength of the inference to be applied. Whether an adverse inference is permissive or mandatory is determined on a case-by-case basis, corresponding in part to the sanctioned party's degree of fault. *See Adkins*, 554 F.3d at 652-53. The court may also consider the facts and evidentiary posture of each case. *Id.* at 653.

First, Plaintiffs argue that the district court's harsh condemnations of the City's behavior with respect to discovery are incompatible with its decision to grant only a permissive adverse inference instruction. If the severity of a spoliation sanction were

required to be based solely on the sanctioned party's degree of fault, this Court likely would be compelled to agree with Plaintiffs that the district court abused its discretion. After all, "intentionality" is the highest degree of fault contemplated by this Court, *see Beaven*, 622 F.3d at 554, and the district court found it to be present in this case. Thus, it would be reasonable to conclude that the highest form of sanction, a mandatory non-rebuttable adverse inference instruction, should be imposed.

However, consistent with this Court's recurring statement that a district court has "broad discretion to craft proper [spoliation] sanctions," *Adkins*, 692 F.3d at 503, the district court here properly considered the facts and evidentiary posture of the case in addition to the degree of fault. The district court noted that making the adverse inference non-rebuttable would "be tantamount to the entry of judgment in Plaintiffs' favor and against the Defendant City" and that Plaintiffs had been given "considerable latitude" in discovery, producing a "voluminous record." In such a case, refusing to grant a non-rebuttable adverse inference instruction was wholly consistent with the district court's thoughtful determination, unchallenged by Plaintiffs, that default judgment was not appropriate.

Second, Plaintiffs argue that a mandatory adverse inference instruction is the only way to "level[] the playing field" and avoid granting the City an undeserved evidentiary windfall. However, a permissive adverse inference instruction does not guarantee anyone a windfall; it leaves the decision in the hands of the jury. Under the circumstances, the district court did not abuse its discretion.

## D.

Having resolved all evidentiary issues, we come to the district court's grants of summary judgment. We review a district court's grant of summary judgment de novo. *Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004) (citation omitted). In reviewing a grant of summary judgment, we must view the facts in the light most favorable to the non-moving party. *Grawey v. Drury*, 567 F.3d 302, 310 (6th Cir. 2009). If the facts are disputed, the court "must presume the [non-movant]'s version." *Id.*

Even if Plaintiffs had a viable underlying wrongful death claim and the City and Kilpatrick both had a custom or policy of obstructing the Greene investigation to which all suspicious transfers, reassignments and evidence disappearances are attributed, Plaintiffs' conspiracy and denial-of-access claims cannot survive because the third element of denial of access, prejudice, is absent. There is no genuine dispute of material fact as to whether, in fact, the obstruction substantially and irreparably prejudiced Plaintiffs' ability to recover on their wrongful death claim by making it impossible to find Greene's killer. *See Swekel*, 119 F.3d at 1264.

Demonstrating substantial and irreparable prejudice does not require a plaintiff to prove that he would have won his underlying claim in the absence of government obstruction. As the Supreme Court pointed out in an earlier denial-of-access case, merely "arguable claims are settled, bought, and sold." *Lewis*, 518 U.S. at 353 n.3. Where there is a known or easily discoverable defendant with whom to bargain on the underlying claim, even a marginal weakening of the underlying claim might suffice to demonstrate substantial and irreparable prejudice because it might have irreversibly reduced the amount for which the defendant would be willing to settle. *See Christopher*, 536 U.S. at 414 (mentioning "inadequate settlement"). However, when there is no defendant with whom to bargain over a settlement, the logic of *Lewis* cannot apply. Without a defendant for the underlying claim, the only way to demonstrate that the obstruction, as a matter of fact, reduced the value of the claim is to show that, without the obstruction, there would have been at least some reasonable likelihood of identifying a defendant.

Plaintiffs fail to point to anything indicating any reasonable probability of Greene's killer being found in the absence of the alleged obstruction. If Stevenson's missing disks and notes contained information likely to lead to Greene's killer, Stevenson should have been able to describe that information. Greene's missing cell phone might have shed light on the killer's identity, but records of the calls made to and from the phone were in the homicide file, and there is no indication of what additional value the phone might have had. Plaintiffs' expert, William R. Rice, testified that the

transfers of the Greene investigation led to losing continuity and trust with witnesses and "interfered with the progress of the investigation," but did not point to any concrete productive lead or witness relationship lost.  Even assuming that all missing items and counterproductive personnel assignments were pursuant to a policy of obstruction, Plaintiffs fail to raise a genuine question of disputed fact as to whether a reasonable probability exists that Greene's killer would have been found absent the alleged policy.  Thus, the district court did not err in granting summary judgment in favor of Kilpatrick and the City of Detroit.

### III.

For the foregoing reasons, we affirm the judgment of the district court.