**Robert and Geraldine KELSO,
Plaintiffs–Appellants,**

v.

**CITY OF TOLEDO, et al.,
Defendants–Appellees.**

Nos. 02–3190, 02–3297.

United States Court of Appeals,
Sixth Circuit.

Oct. 1, 2003.

Before: GIBBONS, SUTTON, Circuit Judges, and TARNOW, District Judge.*

* The Honorable Arthur J. Tarnow, District Court Judge for the Eastern District of Michigan, sitting by designation.

SUTTON, Circuit Judge.

In this action under 42 U.S.C. § 1983, Robert and Geraldine Kelso allege that the City of Toledo and Gerald T. Galvin, the Chief of the Toledo Police Department, violated their constitutional rights by conspiring to conceal evidence that an off-duty officer, Timothy Noble, was intoxicated when his car collided with Mr. Kelso's car. The district court granted summary judgment to the defendants and rejected the Kelsos' motions to alter, amend, or vacate the judgment under Federal Rules of Civil Procedure 59(e) and 60(b). The Kelsos challenge these rulings, as well as the district court's other post-judgment rulings denying them leave to file an amended complaint and leave to obtain the production of certain hospital records. We AFFIRM.

## I. BACKGROUND

On May 13, 1994, Mr. Kelso was injured when a minivan driven by Timothy Noble, an off-duty police officer with the City of Toledo Police Department, veered across the center line and collided with Mr. Kelso's car. One witness to the accident, Jerri Strauss, gave a written statement to officers at the scene that it appeared Noble had "passed out" and was unable to control his vehicle just before the crash. As the first person to approach the vehicles after the accident, she later testified that she had smelled an odor of beer on Noble's breath as she put her head into his minivan. Yet she did not tell officers at the scene that she smelled this odor, and she did not include the information in her written statement to police.

Emergency personnel and police arrived shortly after the accident. As medics assisted Noble, they discovered that he was a police officer (he was wearing his uniform and his car contained police equipment) and notified other officers who were overseeing the accident scene. In view of the involvement of one of its officers in the accident, the Toledo Police Department sent Lieutenant Kevin Keel to the scene to investigate. He arrived about forty to sixty minutes after the accident, by which time both drivers had been taken to their respective hospitals for treatment. Sergeant Layson informed him that another officer was completing an accident report and that several witnesses had given written statements. Lt. Keel reviewed these statements, including Strauss's, but did not speak directly with any of the witnesses. Based on Strauss's description of Noble as having "passed out," and based on the fact that Noble's car had crossed the center line, Lt. Keel asked Sergeant Romstadt of the Toledo Fire Department whether Noble had shown signs of intoxication; Romstadt indicated that Noble had not.

After leaving the accident scene, Lt. Keel proceeded to St. Vincent's Hospital to check on Noble's condition. By the time he arrived, however, Noble had been taken to another area of the hospital for testing, and the two did not speak. While at the hospital, Lt. Keel posed the same question to Dr. Randy King, the emergency room attending physician, that he had posed earlier to Sergeant Romstadt: Had Noble appeared intoxicated? Like Sgt. Romstadt, Dr. King answered that Noble had shown no signs of intoxication. In Lt. Keel's view, Strauss's written statement that Noble had "passed out" in his van, when considered with Romstadt's and King's statements that Noble did not appear intoxicated, did not constitute sufficient evidence to warrant further investigation into the possibility that the crash was alcohol-related. For this reason, he claims, he did not order a blood alcohol test from the hospital. He completed his report by 8:00 p.m. that same day.

The Kelsos sued Noble for the injuries that Mr. Kelso sustained, and for Mrs.

Kelso's loss of consortium with her husband. The case was tried in federal district court before a jury, which awarded Mr. Kelso $437,104 in compensatory damages. The jury did not award punitive damages even though the Kelsos presented evidence that Noble had been intoxicated at the time of the crash. Jerri Strauss testified at trial that she was "100% sure" that she had smelled beer on Noble's breath when she put her head inside his van, and that it was "a lot of alcohol" and not just "a beer." Several officers also testified that they had seen Noble before the accident at a lounge operated by the Toledo Police Patrolman's Association (TPPA). None of them could recall whether Noble had been drinking, although all admitted that alcohol had been served there. Lieutenant Pepitone "surmised" that Noble had been drinking at the lounge, while Noble testified that he could not recall what he had been doing before the accident, but admitted that he had been at the after-shift party, and that it was his "impression" that he had consumed alcohol there.

After the resolution of their negligence claim against Noble in the federal jury trial, the Kelsos filed this lawsuit under 42 U.S.C. § 1983. They allege that the jury's rejection of their punitive-damages claim resulted from the failure of the Toledo Police Department to investigate fully the possibility that Noble had been intoxicated, and that this deliberate failure amounted to a police conspiracy to conceal evidence of his intoxication. In particular, they claim defendants violated their rights because the police department did not require a test of Noble's blood alcohol content, evidence they believe would have strengthened their personal injury suit.

The district court granted summary judgment to the defendants. With respect to Chief Galvin, the district court found the link between Galvin and the alleged misconduct insufficient, as Galvin did not become chief of police until seventy-three days after the accident. With respect to the City of Toledo, the district court found that the evidence did not give rise to a claim under § 1983, because it was reasonable for Lt. Keel to terminate his investigation without further pursuing the question of intoxication. Alternatively, the district court held that even if the police conduct were actionable, the City of Toledo could not be liable under § 1983 for the conduct of its officers, because the Kelsos did not present any evidence of an official policy or custom that would permit this kind of alleged cover-up within the Toledo Police Department.

After the summary judgment ruling against them, the Kelsos made further efforts to obtain relief in the district court. They filed motions under Rules 59(e) and 60(b) to alter, amend, or vacate the judgment. The district court rejected these motions because the Kelsos could have raised, but did not raise, their legal arguments sooner, and because they did not raise any material factual error or offer newly discovered evidence to attack the judgment. The Kelsos also requested leave to file an amended complaint adding claims under 42 U.S.C. §§ 1985 and 1986 and bringing five new defendants into the suit. The district court similarly denied this request, as these claims and defendants could have been brought into the suit earlier, and because, even if allowed, the amendment would be futile. The district court also rejected the Kelsos' final request, that the Toledo Police Department be required to produce Noble's blood alcohol test results (if any exist).

## II.  ANALYSIS

### A.  The Summary Judgment Decision

It is not clear whether the Kelsos' appeal encompasses the denial of their sum-

mary judgment motion, as they filed notices of appeal only as to the denial of their motions to amend or alter the judgment under Rule 59(e), and to vacate the judgment under Rule 60(b). The Kelsos presume that they have appealed the summary judgment decision, and the defendants' brief assumes that the judgment itself is presented for review. In any event, we may construe the Kelsos' appeal from the denial of their Rule 59(e) motion as an appeal taken from the judgment itself. *See GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 833 (6th Cir. 1999). Accordingly, we review the district court's summary judgment decision rejecting the Kelsos' claims.

In doing so, we apply familiar principles. We review a district court's grant of summary judgment *de novo*. *See Russo v. City of Cincinnati*, 953 F.2d 1036, 1041 (6th Cir.1992). In order to prevail on summary judgment, the moving parties–in this case, the City of Toledo and Chief Galvin–must demonstrate that no genuine issue of material fact exists and that they are entitled to summary judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether such evidence has been presented, we draw all justifiable inferences in favor of the Kelsos as the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Despite the voluminous filings that have been produced in this litigation, the plaintiffs have failed to produce any material evidence to support their claims. To make out a claim under 42 U.S.C. § 1983, a party must allege the deprivation of a federal right by a state official acting under color of state law. *See Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). At this stage in the case, plaintiffs bear the burden of producing evidence that at a minimum creates a genuine issue of material fact as to whether the defendants violated their federal rights. *See Jones v. Union County*, 296 F.3d 417, 431 (6th Cir.2002). The Kelsos have not satisfied this requirement with respect to Chief Galvin and the City of Toledo.

### 1. Police Chief Galvin

█ More ambiguity than clarity surrounds the Kelsos' allegations with respect to Chief Galvin. While the complaint names Galvin as a defendant, we cannot find a shred of evidence in the record that ties him to any of the conduct that the Kelsos allege amounted to a cover-up. Most notably, Chief Galvin assumed responsibilities over the Toledo Police Department seventy-three days *after* this unfortunate accident took place. He accordingly did not have, and could not have had, any involvement with the decisions regarding the accident either on the day it happened or for ten weeks afterwards. And the Kelsos do not assert otherwise. They concede that only Lt. Keel conducted the investigation, that the officers at the scene did not include Gerald Galvin, and that Galvin was not chief until well after Lt. Keel completed his investigation of the accident.

In view of the evanescent nature of the evidence allegedly concealed from them, this fact dramatically weakens the Kelsos' claim. Direct evidence of intoxication fades quickly, and the window of opportunity for gathering such evidence, as through a blood alcohol test, is usually only a matter of hours. By the time Chief Galvin assumed his role over the department, any opportunity for obtaining direct evidence of intoxication–if Noble was in fact intoxicated–had long since passed.

In response to this defect in their claim, the Kelsos speculate that even if Galvin was not involved in the initial investigation

of the accident, he is somehow linked to ongoing police efforts to conceal evidence that had already been gathered. All that the Kelsos do to advance this allegation, however, is point to evidence that they uncovered to support their position (at the original trial) that Noble was in fact intoxicated at the time of the accident. The implication is that this evidence was available to police and they either deliberately failed to find it or attempted to cover it up under Galvin's supervision.

Galvin does not dispute that since Lt. Keel completed his investigation, the Kelsos have brought to light further evidence suggesting that Noble was intoxicated. Jerri Strauss, the witness who gave the written statement that Noble had "passed out," later informed the Kelsos that she smelled a very strong odor of beer on Noble's breath. Numerous officers of the Toledo Police Department have placed Noble at an "after-shift" party at the TPPA lounge before the accident. Although most do not recall whether Noble was drinking, they admit that alcohol was served and that it is quite likely that Noble partook. Noble himself, moreover, has admitted that although he cannot remember his whereabouts before the accident, it was his "impression" that he had consumed alcohol at the lounge.

All of this, however, does not suffice to establish a cognizable claim against Galvin. That the Kelsos have uncovered evidence that Lt. Keel did not have available to him at the time he completed his investigation does not amount to direct, or even plausibly inferential, evidence of a cover-up. If anything, the reverse is true. The later surfacing of this evidence cuts swiftly against the Kelsos' speculations that Galvin has led an ongoing cover-up. Rather than facing silence from the Toledo Police Department, the Kelsos have obtained testimony from many of its officers that Noble was at the TPPA party. And Jerri

Strauss admitted that no one tried to persuade her not to divulge her claim that she smelled beer on Noble's breath. Even the most generous reading of this evidence and of the Kelsos' theory of liability establishes that at most Galvin, as head of the Toledo Police Department, failed to pursue every possible lead in an investigation that had become stale by the time he assumed his post. These allegations do not suffice to make out a constitutional claim against Galvin.

### 2. City of Toledo

The Kelsos do not fare any better in their claim against the City of Toledo. Even aside from the absence of evidence of a cover-up, the Kelsos face another problem: They have not satisfied the requirements for holding a city responsible for the acts of its employees.

In order to hold a municipality liable under § 1983, the claimant must show that the employee violated his or her rights in accordance with a pertinent policy or custom of the municipality. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Under *Monell*, it does not suffice to show that an employee of the municipality engaged in behavior that violates the plaintiff's federal rights. The plaintiff, it is by now clear, also bears the burden of identifying the municipal policy or custom that violated these rights. *See Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

The Kelsos have not met this burden. They have not pointed to any policy or custom that permits police to conceal evidence or fail to investigate properly car accidents involving Toledo police officers. In fact, they have demonstrated quite the opposite. The Kelsos' own "expert" witness, Jo Ann Scott, admits that Toledo has a policy *against* the concealment of evi-

dence, a policy that was understood by the department officers and that was in existence at the time of this accident. The Kelsos also offered current Chief of Police Michael Navarre's deposition testimony that the Toledo Police Department policy manual contains, and contained at the time of the accident, a general direction to its officers not to cover up evidence of misdoing by officers. Navarre's affidavit, offered by defendants, elaborates that no policy or custom in place at the time of the accident permitted Toledo police officers to perform incomplete or improper investigations, or intentionally fail to obtain or conceal evidence concerning traffic or criminal violations.

Because the plaintiffs themselves have shown that the Toledo Police Department had a policy against the concealment of evidence and improper investigation of its own officers, the City of Toledo cannot be held vicariously liable under § 1983. The district court properly granted summary judgment on this claim.

## B. The Denial of Post–Judgment Motions Attacking the Judgment

The Kelsos presented a number of motions following summary judgment in an attempt to salvage their lawsuit. They filed (1) a motion to alter or amend the judgment under Rule 59(e), (2) a motion requesting leave to file an amended complaint, which would have added two new claims and five new defendants to the suit, (3) a motion to compel police to produce the results of blood alcohol tests (if any exist), and (4) a motion to vacate the judgment under Rule 60(b). The district court correctly rejected each of these motions.

### 1. The Rule 59(e) Ruling

A Rule 59(e) motion may be granted for any one of three reasons: (1) because of an intervening change in controlling law; (2) because evidence not previously available has become available; or (3) because of a clear error of law or manifest injustice. *Gen. Truck Drivers, Chauffeurs, Warehousemen & Helpers, Local No. 957 v. Dayton Newspapers, Inc.*, 190 F.3d 434, 445 (6th Cir.1999).

In their Rule 59(e) motion, the Kelsos do not appear to raise any new evidence or changes in the law that would impact the result in their case. Instead, their motion speaks to the third ground for granting 59(e) motions–a clear error of law. They attempt to raise new legal arguments that could have been, but were not, brought in their earlier filings with the district court. These legal arguments attempt to zero in on the exact federal right that the defendants deprived them of in violation of § 1983. Whereas their complaint and earlier filings referred generically to equal protection and due process violations, their 59(e) motion argues more specifically that the alleged cover-up by the Toledo Police Department violated their constitutional right of access to courts.

In one respect, the Kelsos are correct. As the defendants concede, the Constitution protects a citizen's right of access to the courts, and that right (we have held) extends to protection against police conspiracies to conceal evidence. *See Swekel v. City of River Rouge*, 119 F.3d 1259, 1262 (6th Cir.1997); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1261 (7th Cir.1984). When a state official acts to cover up evidence of governmental misconduct and when these actions prevent a plaintiff from having an "effective" or "meaningful" state court remedy, the official thus violates the plaintiff's constitutional right of access to courts. *See Swekel*, 119 F.3d at 1262.

The Kelsos, however, have not made a sufficient showing that they suffered the sort of constitutional injury that *Swekel* makes actionable. As indicated above, the evidence in this case shows nothing more than this: The police might have discover-

ed greater evidence that Noble was intoxicated had they investigated further. The evidence does not connect *any* individual, any more than it connected Chief Galvin, to a "cover-up" that could serve as the basis of their § 1983 claim.

Although the lawsuit was filed against Chief Galvin and the City of Toledo, many of the allegations swirl around Lt. Keel's investigation. The Kelsos appear to argue that Keel's conduct amounted to a deliberate failure to investigate and a "cover-up" by the police. Yet, at the time that Lt. Keel concluded his investigation, it is well to remember that he had before him just two pieces of evidence that could reasonably trigger suspicion of intoxication: the fact that Noble's vehicle had crossed the center line and witness Jerri Strauss's statement that she had seen Noble "pass out." Strauss did not tell police at the accident scene, or at any other time shortly after the accident, that she smelled beer on Noble's breath. As she says, the police asked her only "what she saw," not what she smelled. Keel also was not aware of the fact that Noble had been at the TPPA lounge earlier.

Nonetheless, Lt. Keel followed up on his suspicions that alcohol might have impaired Noble's driving. He asked Sgt. Romstadt, as well as Dr. King–both of whom had close contact with Mr. Noble–whether Noble was intoxicated, and both responded that he did not appear to be. Although by nearly all accounts it would have been preferable for Keel to observe or speak with Noble directly, it was not possible in this instance due to the severity of Noble's injuries. In Keel's view, Romstadt's and King's statements, as well as the absence of evidence that Noble had either been driving erratically before crossing the center line or had any open containers in his car, combined to dispel any suspicion created by Strauss's statement and the fact that Noble had crossed the center line. According to Lt. Keel, he thus did not have the probable cause needed to direct the hospital to perform a blood alcohol test and reasonably concluded his investigation without requesting one. The Kelsos do not offer any evidence to contradict Keel's assertion that he did not order a blood alcohol test on Noble.

All of this evidence in the end amounts to variations on a single theme: that the Toledo Police Department failed to investigate the case properly, and if they had done a better job, more evidence that Noble was intoxicated would have been available to the Kelsos at the time of their personal injury suit. It may be that the Toledo Police Department did not pursue all possible leads in investigating Noble. However, laxity in investigation, without active concealment, does not amount to a violation of the Kelsos' constitutional rights. *See Flores v. Satz,* 137 F.3d 1275, 1278 n. 7 (11th Cir.1998); *Bell,* 746 F.2d at 1261–62 (distinguishing active concealment from cases involving officers "lax in their investigatory duties").

Nor may the Kelsos alter this legal conclusion by producing opinions offered as "evidence." For example, the affidavit of Jo Ann Scott and deposition testimony of Chief Navarre variously state that under a hypothetical set of facts, a failure to investigate would rise to the level of a police cover-up. But in the absence of those facts, the opinions themselves cannot suffice to satisfy the Kelsos' summary judgment burden.

The Kelsos offer only one piece of evidence that could possibly be construed as circumstantial evidence of actual concealment, as opposed to a failure to investigate. Jerri Strauss, in her affidavit dated August 7, 2001, states that she saw police officers at the accident scene lean their heads into Noble's minivan, just as she had done. The Kelsos argue that having put

their heads in the van, the officers must have smelled the odor on Noble's breath that Strauss smelled and must have concealed that information from the Kelsos (and impliedly also from Lt. Keel, so that he would not order a blood alcohol test).

Strauss's affidavit, however, is contradicted by her earlier deposition testimony. At her deposition on April 2, 1997, Strauss testified that after officers directed her to move away from the vehicles, she could not get close enough to see what the officers were doing around Noble's minivan. After a motion for summary judgment has been made, a party may not create a factual issue by filing an affidavit that contradicts her earlier deposition testimony. *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir.1986). Even if this affidavit could conceivably be construed as circumstantial evidence of a cover-up, it does not suffice to meet the Kelsos' burden on summary judgment. In short, whether we review the district court's denial of the Kelsos' Rule 59(e) motion for an abuse of discretion or give it *de novo* review, *see Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 454–55 (6th Cir.2003), the decision was correct.

### 2. The Denial of Leave to File an Amended Complaint

■ Following the district court's summary judgment ruling against them, the Kelsos sought leave to amend their complaint to add new claims and new defendants to the suit. Their complaint, as amended, would have included claims under 42 U.S.C. §§ 1985 and 1986, and would have incorporated these claims and all previous claims against five additional, individual defendants–Chief Navarre, Lt. Keel, Lt. Romstadt, Sgt. Layson, and Noble. The district court denied the Kelsos' request for leave to amend the complaint, because they did not raise any claims or add parties that could not have been brought in the original suit.

We review the district court's denial of leave to amend for an abuse of discretion. *Thacker v. City of Columbus*, 328 F.3d 244, 252 (6th Cir.2003). The Kelsos offer no explanation why the district court abused its discretion in denying them leave to file this amendment after summary judgment, and no reasons can be gleaned from the record. The Kelsos were well aware of these individuals' involvement in the Kelso–Noble accident long before the parties filed their summary judgment papers. Indeed, they took trial testimony or a deposition from each of them–except for Romstadt, whose name appeared in Lt. Keel's report on the accident, which the Kelsos have had since early on in this case. For like reasons, the Kelsos do not appear to have gathered any new evidence in the interim that would allow them to bring new claims now that they could not have brought earlier.

### 3. Motion to Compel Production of Blood Alcohol Test

■ After the summary judgment decision against them, the Kelsos also moved the district court to order the defendants to produce the records from St. Vincent's Hospital of any blood alcohol tests done on Mr. Noble relating to the incident. The district court denied the request, explaining that the suit was over.

We review the district court's ruling on the scope of discovery for an abuse of discretion. *Criss v. City of Kent*, 867 F.2d 259, 261 (6th Cir.1988). We cannot conceive how this amounted to an abuse of discretion, since the Kelsos requested the discovery *after* summary judgment and offered no basis for their unusual request. The Kelsos do not offer any indication that the police have possession of Noble's hospital records. In fact, these records, if they exist, are likely as unobtainable to the Kelsos as they are to the police under

Ohio's physician-patient privilege, *see Kromenacker v. Blystone*, 43 Ohio App.3d 126, 539 N.E.2d 675, 677 (Ohio Ct.App.1987), unless Noble had waived his privilege (which the Kelsos do not allege), or the records were requested in connection with a criminal investigation of Noble. *See* Ohio Rev.Code Ann. § 2317.02(B)(2)(a). This ruling, too, was correct.

### 4. The Rule 60(b) Ruling

The Kelsos brought a final motion under Rule 60(b) to vacate the summary judgment, which the district court also denied. We review this ruling for an abuse of discretion as well. *Cacevic v. City of Hazel Park*, 226 F.3d 483, 490 (6th Cir.2000). Like Rule 59(e), Rule 60(b) applies in limited situations: "(1) when the party has made an excusable litigation mistake or an attorney in the litigation has acted without authority; or (2) when the judge has made a substantive mistake of law or fact in the final judgment or order." *Id.* The Kelsos did not raise any argument in this motion, whether legal or factual, as to how any mistake has been made in this case. A district court assuredly does not abuse its discretion in rejecting a motion that lacks either a factual or legal predicate.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment.