RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0106p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DAWN GREEN,

　　　　　　*Plaintiff-Appellant/Cross-Appellee*,

　　　*v.*

CITY OF SOUTHFIELD, MICHIGAN; BRIAN BASSETT;
KEITH BIRBERICK; MARK LABROSSE,

　　　　　　*Defendants-Appellees/Cross-Appellants*.

Nos. 18-1758/1775

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:15-cv-13479—Sean F. Cox, District Judge.

Decided and Filed: May 28, 2019

Before: MOORE, SUTTON, and MURPHY, Circuit Judges.

---

### COUNSEL

**ON BRIEF:** D. Rick Martin, GLOTTA & ASSOCIATES, Detroit, Michigan, for Appellant/Cross-Appellee. Michael T. Berger, SEWARD HENDERSON PLLC, Royal Oak, Michigan, for Appellees/Cross-Appellants.

　　　SUTTON, J., delivered the opinion of the court in which MURPHY, J., joined, and MOORE, J., joined in the judgment. MURPHY, J. (pp. 9–13), delivered a separate concurring opinion in which SUTTON, J., joined. MOORE, J. (pp. 14–16), delivered a separate opinion concurring in the judgment.

---

### OPINION

---

　　　SUTTON, Circuit Judge. Two cars collided in a busy intersection in a Detroit suburb. The police decided that one of the drivers, Dawn Green, ran a red light, and said so in the

accident report, though they opted not to give her a ticket.  Green sued the three officers and their employer, the City of Southfield, alleging that the investigation of the accident violated the U.S. Constitution.  The district court granted summary judgment to the defendants.  We affirm.

I.

One afternoon in October 2012, Green was driving west on Eight Mile Road in Southfield, Michigan, twenty minutes north of Detroit.  William Patterson was heading northbound on Southfield Road, taking his grandson to a medical appointment.  The two vehicles collided in the intersection, Patterson's SUV ramming the driver-side door of Green's sedan.  After impact, the SUV blocked the intersection and Green's car came to rest at a traffic median several hundred feet away.

According to Green, she was briefly knocked unconscious and, after coming to, was dazed and in intense pain, struggling to "recall[ ] everything that occurred."  R. 185-6 at 7.  Other drivers pulled over to help Green, disoriented and with glass in her face, climb out of her car and lay down on the median.

Southfield Officer Rafid Maya arrived at the scene soon after the accident.  He spoke briefly with Patterson, who was out of his car and didn't look injured.  Maya then went to Green, still on her back on the median, appearing stiff and unable to move her limbs.  Because Green "didn't respond too many times," saying just "a few words here and there," Maya refrained from asking many questions after getting her identification.  R. 185-3 at 6–7.

Traffic Specialist Keith Birberick arrived within a few minutes of Maya.  By then, paramedics were looking after Green, and Birberick initially blocked traffic at Patterson's end of the crash scene.  When he came over to Green, she was on a gurney in an ambulance.  He spoke to Green briefly, as Maya told him Green couldn't remember the accident.  Patterson relayed that he had just entered the intersection with a green light when his car "was struck" by Green's car.  R. 185-7 at 5–6.  Birberick did not speak to Patterson's fifteen-year-old grandson, because he believed that, as a passenger, the grandson was not an "independent witness" and that the accident was not severe enough to warrant significant investigation.  *Id.* at 6.  Birberick determined that the physical evidence—the degree and location of the vehicles' respective

damage, the absence of skid marks around Green's vehicle, and the spot where Green's vehicle came to rest—corroborated Patterson's account.

Birberick did not consider the accident serious enough for criminal proceedings or a traffic ticket, so he did not complete a police incident report. He instead filled out the crash report that the State of Michigan requires for highway-safety planning purposes when car accidents lead to injuries. Mich. Comp. Laws §§ 257.622, 257.624(1). In the form's "Hazardous Action" box, Birberick wrote "none" for Patterson and "disregarded traffic [signal]" for Green. R. 185-2 at 2–3. Michigan law provides that such crash reports "shall not be available for use in a court action." Mich. Comp. Laws § 257.624(1).

Green was hospitalized for several days. When she saw the accident report, she contacted Detective Mark LaBrosse at the Southfield Police Department, insisting it was Patterson who ran the light and that she had an eye witness, Douglas Harris, to back her up. LaBrosse followed up with Harris and Patterson as well as with Officer Maya and Specialist Birberick, but LaBrosse and his supervisor (Sergeant Brian Bassett) decided against amending the report. LaBrosse simply added Harris as a potential witness and ordered the records bureau to attach his affidavit to the report.

Green sued Patterson in state court, eventually settling her negligence claim after discovery, case evaluation, and court-ordered facilitation. She then filed this § 1983 and § 1985 action against officers Birberick, LaBrosse, Bassett, and the City of Southfield, alleging that the investigation of the accident violated her equal protection rights under the Fourteenth Amendment and her right of access to the courts under the First (and Fourteenth) Amendment. The district court concluded that the officers deserved qualified immunity and granted summary judgment to several of the defendants. The court refused each side's request for sanctions against the other. Green appeals, and the defendants cross-appeal.

II.

Qualified immunity protects police officers from liability for actions that do not violate clearly established rights apparent to a reasonable officer standing in their shoes. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). At issue on summary judgment is whether a material-fact

dispute stands in the way of the officers' qualified-immunity defense or whether they are entitled to judgment as a matter of law. *Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1131 (6th Cir. 2015); *see Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014). As the opponent of summary judgment, Green gets the benefit of all reasonable inferences from the record. *Northrup*, 785 F.3d at 1131.

*Equal protection.* Green claims that the police officers discriminated against her based on race and sex. More specifically, she alleges that Specialist Birberick did not ask for her account of the crash because she is a black woman but asked for Patterson's account of the accident because he is a white man. Detective LaBrosse and Sergeant Bassett's follow-up investigation, she adds, revealed a similar bias.

The legal premise of her claim is correct. The Equal Protection Clause forbids the State from denying to "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. So too do § 1983 and § 1985, which prohibit state employees from violating a person's constitutional rights in the first instance, and conspiring to deprive someone of equal protection in the second. The upshot for purposes of this case is that a party alleging race or sex discrimination must show that the challenged law-enforcement practice "had a discriminatory effect and was motivated by a discriminatory purpose." *Cornwell v. Bradshaw*, 559 F.3d 398, 411 (6th Cir. 2009). And to prove a discriminatory effect, the plaintiff must show that similarly situated individuals were not subject to the challenged police actions. *See Abdul-Khaliq v. City of Newark*, 275 F. App'x 517, 521 (6th Cir. 2008).

The factual premise of her claim, however, is incorrect. Green and Patterson were not similarly situated, and those differences justified the way the officers responded to the accident. Birberick testified that he did not ask Green what happened because Officer Maya told him she couldn't remember. All of the evidence, including Green's own testimony, confirms Maya's summation: She was "dazed," "confused," "out of it," "disoriented," and struggling to respond to questions. R. 185-3 at 6; R. 185-6 at 7; R. 185-19 at 2. On top of that, she lay on the ground, visibly injured, and in intense pain. Patterson by contrast was on his feet, uninjured, and ready to describe the collision. Birberick had ample reason to ask Patterson what happened but not to ask Green the same.

Green protests that we are required to accept as true her assertion that she *would* have given a statement if asked.  But that assertion appears in an affidavit that (apparently) never made it into the summary judgment record before the district court.  The relevant point at any rate isn't whether Birberick could have coaxed Green's story out of her had he tried; it's whether he had good reason to leave her alone.  No material-fact dispute clouds that issue.

Pushing the point one step further, Green invokes the testimony of Douglas Harris, who was at the scene and who allegedly testified that Green could communicate and that no police officer came to talk to her.  But a perusal of Harris's testimony does not turn up any such statement.  Harris in fact said that he did "[n]ot really talk[]" to Green because "she was in a daze," and that he left the scene without attempting to speak to anyone.  R. 196-2 at 8.  In the absence of any differential treatment of similarly situated individuals, Green's equal protection theories of relief fail as a matter of law.

*Access to courts.*  Green also claims that Specialist Birberick's failure to solicit statements from witnesses at the accident scene crippled her lawsuit against Patterson, forcing her to settle for a lower amount—$95,000—than she deserved.  Here, too, the legal predicate of her claim is correct but the factual predicate is not.

The Constitution protects an individual's access to the judicial system—the right to bring a non-frivolous claim in a court of law.  *See Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002).  That right extends to protection from government conspiracies to destroy evidence if those actions prevent a plaintiff from having an "adequate remedy on the underlying claim." *Flagg v. City of Detroit*, 715 F.3d 165, 173 (6th Cir. 2013); *see Swekel v. City of River Rouge*, 119 F.3d 1259, 1262 (6th Cir. 1997).  At the same time, a difference exists between an "active concealment" or destruction of evidence on the one hand and a failure to "pursue all possible leads" on the other.  *Kelso v. City of Toledo*, 77 F. App'x 826, 832–33 (6th Cir. 2003); *see Flores v. Satz*, 137 F.3d 1275, 1278 & n.7 (11th Cir. 1998) (per curiam).  Mere "laxity in investigation" is not a constitutional violation.  *Kelso*, 77 F. App'x at 833.

This case falls (at worst) on the "mere laxity" side of the line.  As in *Kelso*, "[t]he police might have discovered greater evidence [to support the plaintiff's state claim] had they

investigated further." *Id.* at 832–33. But no one claims that Birberick took witness statements and then destroyed them, or that he deleted case notes or log sheets to deprive Green of favorable evidence. *See Flagg*, 715 F.3d at 169–71, 178; *Swekel*, 119 F.3d at 1260, 1264.

Failure to solicit additional witness statements, when the physical evidence supports the only account offered at the scene, is a sizeable step removed from that problem. Still further removed is the failure to canvas for the identity of additional witnesses. No witnesses approached Birberick or Maya. It appears that no witnesses remained at the scene by the time Birberick came over to Green, as the friendly drivers who helped Green out of her car left when the paramedics put her in the ambulance, and Birberick came over only afterwards. On this record, no cognizable access-to-the-courts claim exists.

*Municipal liability.* Green adds that the police department maintains an unconstitutional policy of not investigating citizen complaints if they think a lawsuit is in the offing. But because her related claims against the officers fail on the merits, her municipal liability claim premised on those claims necessarily fails as well. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *D'Ambrosio v. Marino*, 747 F.3d 378, 391 (6th Cir. 2014).

*Motion to amend the complaint.* Green separately challenges the court's denial of her motion to file what would have been her seventh complaint. The Civil Rules grant plaintiffs the chance to file one no-questions-asked amended complaint. Fed. R. Civ. P. 15(a)(1). After that, they need permission, which the court should "freely" grant in the ordinary course, *id.* at 15(a)(2), but which it may deny for a host of reasons—undue delay being one of them, *see Foman v. Davis*, 371 U.S. 178, 182 (1962). Abuse of discretion is the watch phrase on appeal. *Id.*

After filing her original complaint and her first amended complaint, Green filed two more without permission. After that, however, the court gave her a strict deadline for any more amendments. She timely moved for another, but then filed a different version before the court granted her motion. Nine months later (over a year after the lawsuit began), Green moved to file yet another amended complaint, her seventh in all, this time seeking to add five defendants, all of whom she knew about from the outset of the case. Because the Federal Rules command just one

free pass, not seven, and because she did not have a good explanation for the last amendment, the district court did not abuse its discretion in denying Green's motion.

*Discovery sanctions.* Green appeals the court's denial of her motion for discovery sanctions under Civil Rules 26 and 37, and 28 U.S.C. § 1927, as well as under the court's inherent authority, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–44 (1991). We review for abuse of discretion, *id.* at 55; *see Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990), and find none. The court reasonably explained that it would not impose sanctions because the defendants eventually produced the materials Green wanted, because none of the late-produced materials affected the case's outcome, and because Green's counsel contributed his share of unnecessary delay and expense.

Green argues that the court should have analyzed each discovery allegation separately. But the court's explanation for denying sanctions applies to each one. On top of that, Green suggests that the court failed to consider the correct legal standard. The court did not cite the standard, it is true. But that reality does not by itself make the order illegal, and at all events Green never shows how the court's reasoning varied from the proper standard.

*Attorney's fees.* The defendants cross-appeal on the ground that the court should have imposed attorney's fees on Green. In this setting, a court may award a prevailing defendant reasonable fees, provided the lawsuit was frivolous. 42 U.S.C. § 1988(b); *Hughes v. Rowe*, 449 U.S. 5, 14 (1980) (per curiam). Abuse-of-discretion review once again applies. *Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 702 (6th Cir. 2016). None occurred. The court reasonably denied the defendants' motion on the ground that the discovery and motions practice had been "very contentious, on both sides" and on the ground that "this is not an egregious case." R. 229 at 1, 3.

The defendants counter that (1) Green knew she was dazed at the crash scene and thus knew from the beginning that she was not similarly situated to Patterson, and (2) she should have known the defendants did not conceal any evidence and that accident reports are inadmissible in Michigan courts. That Green did not draw the same legal conclusions from these facts as the defendants, however, does not mean the denial of fees is an abuse of discretion. Yes, a different

trial court might have reached a different conclusion. But that reality squares with another reality—that our deferential standard of review permits two opposing decisions both to fall within it.

We affirm.

———————————

**CONCURRENCE**

———————————

MURPHY, Circuit Judge, concurring.  I join the Court's opinion in full and write only to express some reservations with the specific type of access-to-court claim that Dawn Green asserts here.  This claim's contours have been described as "'nebulous.'"  *Foster v. City of Lake Jackson*, 28 F.3d 425, 430 (5th Cir. 1994) (citation omitted).  That strikes me as a fitting description.  Because the claim's scope has not been thoroughly briefed in this case, I add just a few thoughts to highlight tensions I see between this claim and the general constitutional corpus juris.

To be clear at the outset: "It is beyond dispute that the right of access to the courts is a fundamental right protected by the Constitution."  *Graham v. Nat'l Collegiate Athletic Ass'n*, 804 F.2d 953, 959 (6th Cir. 1986).  Under this right, a state generally may not discriminate against out-of-staters in their ability to access its courts.  *See McBurney v. Young*, 569 U.S. 221, 231 (2013); *Corfield v. Coryell*, 6 F. Cas. 546, 551–52 (Washington, Circuit Justice, C.C.E.D. Pa. 1823).  Nor may the state physically bar certain individuals from filing suit.  *See Ex parte Hull*, 312 U.S. 546, 548–49 (1941).  And a state, of course, may not disrupt an individual's ability to uncover a legal claim for racially discriminatory reasons.  *See Bell v. City of Milwaukee*, 746 F.2d 1205, 1259–65 (7th Cir. 1984), *overruled on other grounds by Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005).

But Green's access-to-court claim—as distinct from her equal-protection claim alleging race and sex discrimination—proposes a far more expansive (and elusive) right.  Injured in a car accident, Green asserts that the other driver ran a red light.  Yet she was able to file a tort suit against him and use the state court's discovery tools to develop evidence in support.  She thus cannot allege that the defendants in this case barred her from uncovering or prosecuting her claim.  She instead alleges that they wrongly decided that she was at fault after a slipshod investigation, which allegedly pressured her to settle the tort suit for an inadequate amount.

By "substantially prejudicing" her suit, Green's argument goes, the police denied her access to the state courts.

This type of access-to-court claim is of recent vintage, seemingly dating back to *Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983). The Supreme Court has considered it only once. *Christopher v. Harbury*, 536 U.S. 403, 414 n.9 (2002). And, "[a]s Judge Michael W. McConnell stated shortly after [that] decision, '[t]he Supreme Court was careful *not* to endorse the [claim's] validity.'" *Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012) (quoting *Jennings v. City of Stillwater*, 383 F.3d 1199, 1209 (10th Cir. 2004)). Two circuits have declined to expressly endorse it. *See Sousa*, 702 F.3d at 128; *Jennings*, 383 F.3d at 1207–09. Our Court, too, has described it as "much less established." *See Flagg v. City of Detroit*, 715 F.3d 165, 173 (6th Cir. 2013). In short, the claim remains a work in progress. Courts opting to recognize the claim, it seems to me, should apply it in a manner that adheres to (at least) three established constitutional principles.

Principle One: Consider how the Supreme Court treats torts by public actors. Whenever state actors negligently injure persons or damage their property, the state does not thereby "deprive" them of their "liberty" or "property" under the Due Process Clause. *Daniels v. Williams*, 474 U.S. 327, 331–33 (1986). Even when a public actor intentionally pilfers property, the state has not violated due process if it permits the owner to seek redress in court. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *see Parratt v. Taylor*, 451 U.S. 527, 537–44 (1981). "The commonsense teaching of [these cases] is that some questions of property, contract, and tort law are best resolved by state legal systems without resort to the federal courts, even when a state actor is the alleged wrongdoer." *Albright v. Oliver*, 510 U.S. 266, 284 (1994) (Kennedy, J., concurring in judgment).

Why should a state actor's interference with a claim for damages to a car receive greater constitutional scrutiny than the actor's outright theft of the car? After all, "'a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause.'" *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 485 (1988) (citation omitted). I tend to think that the Justices' tort teachings apply to legal claims (a kind of intangible property) as much as they do to tangible property. These teachings should inform what we mean when we

say that an access-to-court claim requires "obstructive actions by state actors." *Flagg*, 715 F.3d at 174. That phrase covers, as the Court today holds, only *deliberate* misconduct (not *negligent* investigations). *See Daniels*, 474 U.S. at 331–33. Even with respect to deliberate misconduct, these teachings should inform what we mean when we say that an access-to-court claim requires proof that a litigation-related injury "cannot be remedied by the state court." *Flagg*, 715 F.3d at 174. That phrase "should require that the plaintiff allege and prove that the state's judicial process does not provide fair procedures to remedy the wrong alleged." *Swekel v. City of River Rouge*, 119 F.3d 1259, 1265 (6th Cir. 1997) (Merritt, J., concurring); *see Hudson*, 468 U.S. at 533. Here, however, Green has not identified any defect in the state courts that barred her from uncovering the evidence on which she relies; in fact, she generated much of that evidence in those courts. But the federal access-to-court claim is supposed to vindicate the underlying state suit, not the other way around.

Principle Two: Consider what the Supreme Court has said about the government's duty to provide citizens with information in its possession. "'The Constitution itself is [not] a Freedom of Information Act.'" *Houchins v. KQED, Inc.*, 438 U.S. 1, 14–15 (1978) (plurality opinion) (citation omitted). Thus, "there is no constitutional right to obtain all the information provided by FOIA laws." *McBurney*, 569 U.S. at 232. This rule, moreover, does not end at the courthouse door. "It is well settled that parties to judicial or quasi-judicial proceedings are not entitled to discovery as a matter of constitutional right." *NLRB v. Valley Mold Co.*, 530 F.2d 693, 695 (6th Cir. 1976). Even in criminal cases, the Supreme Court has explained that "[t]here is no general constitutional right to discovery" when clarifying the reach of *Brady v. Maryland*, 373 U.S. 83 (1963). *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).

If the Constitution generally does not require the government to disclose information to citizens who request it for *speech* purposes, *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 40 (1999), I do not see why the Constitution (as compared to discovery rules) should generally require the government to disclose information to citizens who request it for *litigation* purposes. Indeed, the Supreme Court has (sometimes) placed the right to access the courts in the First Amendment's Petition Clause, *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 386 (2011), and has said that the Free Speech and Petition Clauses often should be read the same

way, *see id.* at 388–89.  These access-to-information cases should inform what we mean when say that a public actor's concealment of information caused "'substantial prejudice'" to a claim. *Flagg*, 715 F.3d at 174 (citation omitted).  It should not suffice to show that the government failed to turn over information that would have been helpful to a claim; otherwise, courts risk creating a constitutionally compelled "litigation hold" for all public information in conflict with the Supreme Court's cases.  *McBurney*, 569 U.S. at 232.  Instead, an alleged concealment must have effectively (even if not physically) "den[ied] the plaintiffs the opportunity to file a lawsuit." *Thompson v. Boggs*, 33 F.3d 847, 852 (7th Cir. 1994).  Here, however, Green "knew the identity of the defendant and had all of the requisite facts to file" her tort claim.  *Swekel*, 119 F.3d at 1263.

Principle Three: Consider that this specific access-to-court claim emerged from cases in the prison setting like *Bounds v. Smith*, 430 U.S. 817 (1977).  *See Crowder v. Sinyard*, 884 F.2d 804, 811 (5th Cir. 1989), *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990).  Yet the Supreme Court has cautioned that the constitutional principles applicable to prisoners do not neatly map over to the general populace.  "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989).  That logic does not extend to those free of a state's constraints.  *Id.* at 199–201.  That the government may have a duty to provide prisoners with "adequate food, shelter, clothing, and medical care," *see Youngberg v. Romeo*, 457 U.S. 307, 315 (1982), does not mean that it must also furnish the entire population with their "most basic economic needs," *Dandridge v. Williams*, 397 U.S. 471, 485 (1970).

If this distinction applies to constitutional questions concerning the necessities of life, I would think it covers access-to-court claims too.  "Unlike prisoners, ordinary individuals do not find any physical barriers between them and the courts."  *Crowder*, 884 F.2d at 811.  Thus, courts should not presume that what the Supreme Court has found to be required for "'adequate, effective, and meaningful'" court access in the prison context automatically applies outside a prison's walls.  *Cf. Swekel*, 119 F.3d at 1262 (quoting *Bounds*, 430 U.S. at 822).  Even in that context, the Court has since *Bounds* "disclaim[ed]" any "suggest[ion] that the State must enable

the prisoner to *discover* grievances, and to *litigate effectively* once in court." *Lewis v. Casey*, 518 U.S. 343, 354 (1996). If that is true there, it must be true here. But, as far as I can see, Green's claim alleges nothing more than that the police's investigation undermined her ability to litigate effectively.

At day's end, I worry that the main thing justifying an elastic access-to-court claim is the instinct that, no matter its text, the Constitution must be read to afford an all-purpose remedy for whenever state actors are alleged to behave poorly. It's a natural instinct to be sure. But it's not one that the Supreme Court's cases allow us to indulge.

---

### CONCURRING IN THE JUDGMENT

---

KAREN NELSON MOORE, Circuit Judge, concurring in the judgment.  The majority today concludes that because Dawn Green has not shown that the defendant officers either actively concealed or destroyed evidence relating to her state-law claim, Green has not sufficiently established a violation of her constitutional right of access to the courts.  Although I agree that Green has not established that her right of access to the courts was violated, I concur in the judgment only, because I believe this case is resolved on another, more established, basis.

"It is beyond dispute that the right of access to the courts is a fundamental right protected by the Constitution."  *Swekel v. City of River Rouge*, 119 F.3d 1259, 1261 (6th Cir. 1997) (quoting *Graham v. Nat'l Collegiate Athletic Ass'n*, 804 F.3d 953, 959 (6th Cir. 1986)).  Indeed, the right originates "in several provisions of the Constitution including:  the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause, the First Amendment, and the Privileges and Immunities Clause of Article IV."  *Id.* at 1262 (internal citations omitted).  As the Supreme Court has recognized, access claims generally fall into two categories:  forward-looking and backward-looking claims.  *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).  Backward-looking claims, at issue in Green's case, consider situations in which a previous litigation "ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable."  *Id.* at 414 (footnotes omitted).  Thus, the "ultimate goal" of backward-looking access claims is "simply the judgment in the access claim itself, in providing relief obtainable in no other suit in the future."  *Id.*

Although some circuits have expressed skepticism regarding the availability of backward-looking access claims, *see Sousa v. Marquez*, 702 F.3d 124, 127–28 (2d Cir. 2012), we have expressly recognized these claims, *see Flagg v. City of Detroit*, 715 F.3d 165, 173 (6th Cir. 2013); *Swekel*, 119 F.3d at 1262.  Indeed, in *Flagg v. City of Detroit*, this court established a binding four-part test to analyze these claims.  In order to show a backward-looking access claim, plaintiffs must show:  "(1) a non-frivolous underlying claim; (2) obstructive actions by state actors; (3) substantial prejudice to the underlying claim that cannot be remedied by the state

court; and (4) a request for relief which the plaintiff would have sought on the underlying claim and is now otherwise unattainable." *Flagg*, 715 F.3d at 174 (internal quotation marks and citations omitted) (alteration incorporated).

The majority today focuses on the second *Flagg* factor ("obstructive actions by state actors"), concluding—for the first time in a published opinion in this Circuit—that such actions must amount to either active concealment or destruction of evidence. The majority's discussion of the obstruction prong, however, is wholly unnecessary to resolve this case. Rather, I follow the lead of the panel in *Flagg* and conclude that because Green cannot satisfy the third *Flagg* factor ("substantial prejudice to the underlying claim that cannot be remedied by the state court"), Green cannot survive summary judgment.

"Demonstrating substantial and irreparable prejudice does not require a plaintiff to prove that he would have won his underlying claim in the absence of government obstruction." *Id.* at 178–79. Indeed, the Supreme Court has noted that even "arguable claims are settled, bought, and sold." *Lewis v. Casey*, 518 U.S. 343, 353 n.3 (1996). Rather, "[w]here there is a known or easily discoverable defendant with whom to bargain on the underlying claim, even a marginal weakening of the underlying claim might suffice to demonstrate substantial and irreparable prejudice because it might have irreversibly reduced the amount for which the defendant would be willing to settle." *Flagg*, 715 F.3d at 179; *cf. Jennings v. City of Stillwater*, 383 F.3d 1199, 1209 (10th Cir. 2004) (concluding that the plaintiff was not prejudiced, in part because she was ultimately able to achieve the remedy she sought—a settlement—and she did not allege "that the settlement amount was inadequate on account of the government's actions so as to deny her meaningful relief"); *see also Harbury*, 536 U.S. at 414 (mentioning "inadequate settlement").[1]

In the current case, Green cannot show that Traffic Specialist Keith Birberick's failure fully to investigate the traffic accident prejudiced her underlying state claim against the other

---

[1]My colleagues today also suggest that in order to show prejudice, a plaintiff should be required to establish that the government's obstructive actions effectively denied her the ability to *file* a case. *See* Concurrence at 12. This ignores both our established precedent in *Flagg*, 715 F.3d at 178–79, as well as the Supreme Court's recognition that in the context of access claims, non-frivolous claims that are "lost, rejected, or impeded" may form the basis of a viable cause of action, because even "arguable claims are settled, bought, and sold," *Casey*, 518 U.S. at 353 nn.3–4.

driver, William Patterson. Green was able to file her suit against Patterson, conduct discovery, and settle the case. Indeed, Green admits that the very evidence she faults the officers for failing to obtain—witness Douglas Harris's and Green's versions of the accident—was included in her case against Patterson; in her federal-court deposition, Green stated that she and Harris could have testified to rebut the allegedly inaccurate information contained in the traffic report. *See* R. 185-6 (Green Dep. at 11) (Page ID #5422) (testifying that she could have testified and told her story); R. 185-20 (Pl.'s Response to Defs.' Statement of Facts at 4) (Page ID #5531) (admitting that Green "intended to call Douglas Harris as an independent witness"). Admittedly, in an affidavit in response to the Defendants' motion for summary judgment, Green asserted that she chose to settle the state case against Patterson in part because the state-court judge told her that Harris's credibility had been undermined because he had not been interviewed at the scene of the accident and, therefore, she did not have a credible eyewitness to refute Patterson's version of events. R. 201 (Green Affidavit at 5) (Page ID #6720). However, as noted above, Green explained that she could have testified, thus permitting her to refute Patterson's claims, corroborate Harris's testimony, or explain why Harris was not questioned at the scene. R. 185-6 (Green Dep. at 11) (Page ID #5422). Moreover, Harris's credibility was not the only reason Green decided to settle her case. *See* R. 201 (Green Affidavit at 5) (Page ID #6720) (explaining that the settlement amount was "the highest amount the judge could get the insurer to pay").

In sum, I concur in the judgment only. I rest my decision on Green's failure to show "substantial prejudice" under *Flagg* and find it unnecessary to explore the full contours of *Flagg*'s "obstructive actions" requirement, which can await another case and another day.