NOT RECOMMENDED FOR PUBLICATION

File Name: 20a0164n.06

Case No. 19-1242

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| TIMIKA KEATHLEY, | ) | |
| | ) | **FILED** |
| *Plaintiff-Appellant*, | ) | Mar 19, 2020 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | **ON APPEAL FROM THE** |
| GRANGE INSURANCE COMPANY OF | ) | **UNITED STATES DISTRICT** |
| MICHIGAN, | ) | **COURT FOR THE EASTERN** |
| | ) | **DISTRICT OF MICHIGAN** |
| *Defendant-Appellee*. | ) | |

Before: BATCHELDER, WHITE, and THAPAR, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** In this appeal, an insured homeowner argues that the district court erred by granting summary judgment to her insurer on her claims for insurance coverage and her motion for sanctions. The district court's excellent opinions are thorough and correct. *See Keathley v. Grange Ins. Co.*, No. 15-CV-11888, 2019 WL 423838, at *1 (E.D. Mich. Feb. 4, 2019) (granting summary judgment); *Keathley v. Grange Ins. Co.*, No. 15-CV-11888, 2018 WL 1406838, at *1 (E.D. Mich. Mar. 21, 2018) (denying spoliation sanctions). For the reasons stated by the district court and the reasons that follow, we AFFIRM.

On December 6, 2013, Timika Keathley bought a house for $200,000. For several years, Keathley had been "flipping" houses—buying, rehabilitating, and reselling or renting them—through her business, Sincere Investments LLC, so she has experience with the process. She is also, in her own words, "highly intelligent and I know what to do and what not to do." Keathley did not intend to flip this house, however; she intended to live there. Prior to closing, she received

1

a $4,500 credit when the home inspection revealed some issues, including mold throughout the basement. On January 15, 2014, she bought a homeowner's insurance policy from Grange Insurance Company of Michigan, effective as of the December 6, 2013, closing date.

On Friday, April 4, 2014, Grange received an email from a woman named Margie Banks, who calls herself a "public adjustor" and who, apparently, represents Keathley in some capacity:

| | |
|---|---|
| From: | Margie Banks [email address] |
| Sent: | Friday, April 04, 2014 11:32 AM |
| To: | [Grange Insurance] LossRept |
| Subject: | New claim |
| Attachments: | Timeka [sic] Keathley contract.jpg |

This email is to file a new claim on behalf of Mrs. Timeka [sic] Keathley. The address is 42746 Alba Ct, Van Buren Twp MI 48111

On January 28th, 2014 Mrs. Keathley received a phone call from her painter that when he arrived at the home to paint he found water damage through out [sic] caused by frozen pipes. The furnace has stopped working for a period of time possibly caused by a temporary power outage in the area during a winter storm.

Mrs. Keathley originally tried to claim the damages under her home warrenty [sic] program as she had just purchased the home. The home warrenty [sic] company is not going to cover the claim.

Mitigation is complete and repairs are almost complete at this time. Mrs. Keathley has documented the damages with photos.

The contact info for this claim is: Margie Banks - Public Adjuster - [phone number]. A copy of our contract is attached to this email.

R. 74-6 at 2, PgID 4240. Notice three things about this email. First, Banks labeled this "a new claim" and, to be sure, this was the first claim anyone had filed with Grange on this policy or concerning this incident. Second, Banks said that it was Keathley's painter who discovered the frozen pipes and widespread water damage on January 28, 2014. But Keathley and her painter, Eddie Lulaj, deny this—each testified that when Lulaj called Keathley on January 28, he told her only that the furnace was off and the house was very cold; both testified that there were no burst pipes or water damage at that time. Keathley testified that she and her boyfriend, Michael Green,

2

found the burst pipes and water damage on Sunday, February 2. And third, Banks told Grange that "mitigation is complete and repairs are almost complete" and that Keathley "documented the damage with photos." But Keathley had not documented the damage with photos.

Banks then prepared a detailed, 30-page "estimate," which asserted that Keathley was entitled to reimbursement of $132,773.06 for the expenses she incurred in repairing the damage. Although most or all of the work had already been completed, this was an "estimate" because Keathley did not have any documentation. She had no contemporaneous documentation of the damage, the remediation, or the repairs—no photos, no testing results, no records. She had no written contracts with anyone who performed any of the cleanup, remediation, or repairs. She had no invoices or receipts; not even a credit card statement. Nor did she pursue copies of any invoices or receipts from any contractors, service providers, suppliers, or retail stores. She claims that she gave Grange the names and contact information for the people who did the work, but she produced no affidavits or depositions from any of them for this litigation. In short, Keathley's position is that she spent $132,773.06 entirely in cash, she kept no receipts, and Grange should "reimburse" her despite this lack of any documentation. Grange was suspicious.

Moreover, as Banks admitted, because Keathley had no documentation, the "estimate" was a fabrication based on Banks's inspection and measurements of the house *after* the cleanup and renovation, and drawn from Banks's imagination. Banks "estimated" (or made up) costs for renovations in every room in the house, replacement of "missing walls," a new furnace, and a new water heater. She included costs for the "replacement" of oak hardwood flooring (including specific "estimates" for installation, sanding, staining, and finishing) in areas that had previously had vinyl or carpet floor covering. She "estimated" the cost for a professional remediation company to do the "dry out" work that was done by Keathley's boyfriend and his sons. She "estimated" $12,590.31 for "demolition" that was done by Keathley's friends and family. And

3

she "estimated" a price for certified, professional mold remediation by Professional Environmental Services, Inc., even though Joe Tison from RestoJoe did the only mold treatment that was done— that was not a formal or professional mold abatement or remediation, and Tison never provided an actual invoice, much less a completion report or certification.

Grange assigned an adjuster named Jason May who requested documentation (such as moisture logs, repair invoices, or photographs) from Banks, without success, and who inspected the property on May 28, 2014. Grange also assigned Jeanne Strick from its Special Investigative Unit to investigate for insurance fraud. Strick reviewed May's findings, collected additional evidence, and questioned Keathley under oath and while represented by her attorney.

Keathley testified that she and Green entered the house on or about the evening of Sunday, February 2, the weekend of the Super Bowl, and found water "shooting" out of the faucet in the laundry room and from under the sink "like a waterfall." They shut off the water valve in the basement and found burst pipes "throughout" the house and so much water that they were able to "push" it. Keathley testified that her father and Green's family helped to soak up the water with towels and remove debris from the house. She testified that "Collin from CLA Plumbing" came that night and removed the damaged pipes. Keathley did not take pictures of the standing water, the cleanup, the damaged pipes, or the plumber's activities. Keathley paid the plumber in cash and did not receive, keep, or later obtain any receipt for that service. When Jeanne Strick obtained the records from the city water department, she found that the date of (or dates surrounding) this incident did not show substantial water usage, as would be expected, but instead showed minimal water use consistent with an unoccupied house. Strick also obtained a record from the home-warranty company, documenting a call received from Keathley on Friday, January 31, in which Keathley said the furnace was broken and water pipes in her basement had burst and were leaking, to which the company answered that her warranty did not cover burst water pipes.

4

Keathley testified that she had a dumpster delivered to her house the day after discovering the burst pipes and that Green and his sons filled multiple dumpsters as they removed wet drywall and flooring, the "busted pipes," and other debris, including a jacuzzi tub. Keathley paid cash for the dumpsters, paid cash to Green and his sons for the debris removal, and paid cash for big fans that Green brought in to dry out the house. She had no invoices or receipts for any of these expenses. Joe Tison testified that he used three extra-large dehumidifiers to dry the house and that they ran continuously for six days, but he did not take any moisture readings, document conditions, or prepare any invoice. Tison says that he subbed out the flooring repair and painting work but had no documentation and cannot recall who did the work. Presumably, he paid them, but he testified that Keathley never paid him. The utility bills from the electric company did not show the spike in electricity usage that such large fans and dehumidifiers typically cause.

Ultimately, Keathley testified that she and Green "gutted the house," completed the demolition, replaced the plumbing, re-laid the bathroom floors, and replaced the kitchen floors and cabinets, all before filing the claim with Grange on April 4, 2014. She attested that she had no documentation and had paid everything in cash, without invoices, receipts, or proof of payment. By the time Jason May visited the property, there was no identifiable damage; repairs were essentially complete and the house extensively remodeled. There was debris in the dumpsters, a pile of damaged pipes in the basement, and some unfinished walls and ceilings. Keathley produced some photos of post-demolition cleanup in the basement. Banks testified that she had taken pictures of the damage, but she could not produce those pictures. Joe Tison also testified that he took pictures of the pipes piled in the basement, but he could not produce them.

Despite its suspicions and Strick's thorough investigation, Grange did not prosecute this as insurance fraud, but merely denied Keathley's claim. The pertinent policy provisions say:

5

SECTION I - PROPERTY PROTECTION CONDITIONS

1.  What to do in Case of Loss

    If a covered loss occurs, the insured person must:

    a.  give immediate notice to us or our agent. . . . ;
    b.  protect the property from further damage, making necessary and reasonable repairs to protect the property, and keep records of the costs of repairs;
    c.  make an inventory of all damaged or destroyed property, showing in detail the quantity, cost, description, actual cash value and amount of loss claimed. Attach all bills, receipts and related documents that justify the figures in the inventory;
    d.  send to us, within 60 days after we request, the above inventory and a proof of loss signed and sworn to by the insured person, including:

        (1) the time and cause of loss;
        (2) the interest of insured persons and all others in the property;
        (3) all encumbrances on the property;
        (4) other insurance that may cover the loss;
        (5) changes in title, use, occupancy or possession of the property during the term of the policy; and
        (6) if required, any plans and specifications of the damaged buildings or fixtures and detailed estimates for repair of the damage;

    e.  exhibit the damaged property to us or our representative, as often as may be reasonably required;
    f.  submit to examinations under oath by any person named by us, while not in the presence of any other insured person, and sign the transcript of the examinations;
    g.  produce for examination, with permission to copy, all books of account, bills, invoices, receipts and other vouchers as we may reasonably require;
    h.  produce receipts for any increased costs to maintain your standard of living while you reside elsewhere, and records pertaining to any loss of rental income;
    i.  cooperate with us in the investigation of a claim; and
    j.  produce evidence or an affidavit supporting a claim under the Credit Card, Electronic Fund Transfer Card, Forgery and Counterfeit Money under Section I - Additional Coverages, stating the amount and cause of loss.

R. 77-1 at 35, PgID 4566.

9.  Suit or Claims Against Us

    We may not be sued unless there is full compliance with all the provisions and conditions of this policy. Any suit must be commenced against us within the applicable statute of limitations. A claim for loss must be submitted within one year after the loss or damage occurs.

R. 77-1 at 38, PgID 4569.

The district court determined that Keathley had failed to satisfy conditions 1.a, requiring timely notice of the loss, and 1.e, exhibiting the property. In the district court and again on appeal, Keathley argues that she did provide timely notice and never refused a request to exhibit the property. Within days of the incident, Keathley called her local insurance agent, Karen Lamerton of Insurance One, who had sold Keathley the Grange policy, to ask about her options, but she expressly told Lamerton not to file a claim. Keathley contends that this call gave Grange timely notice of the incident and, even though she was effectively telling Grange to keep out of it (as she was not filing a claim), she would have willingly exhibited the property if Grange had asked. It is undisputed that Keathley instructed Lamerton *not* to file a claim with Grange and that Lamerton did not contact Grange to advise the company of the loss. Therefore, the district court explained:

> Grange cannot be charged on these facts with notice that [Keathley] was seeking to file a claim for a covered loss. Here, Ms. Lamerton specifically received notice of *no* claim, knowledge which, if imputed to Grange, is just that: *not notice* of a claim or notice of *no claim*. What does [Keathley] propose Grange could have done with such knowledge—arrive at the Property to investigate an occurrence for which a claim had not been filed? Finding notice sufficient under such circumstances would undermine the very purpose of the immediate notice provision, which is to give the insurer the opportunity to promptly investigate and evaluate a claim. Where no claim is being made and the insurer is not in fact apprised of the occurrence, any 'notice' given to an agent is necessarily 'not notice' to the insurer to begin the investigative process.

*Keathley*, 2019 WL 423838, at *8 (quotation marks, editorial marks, and citations omitted). Amusingly, the court's rhetorical question is Keathley's criticism—i.e., that Grange had "notice" within a week of the incident but did not attempt to inspect the property until May 28.

Keathley argues, alternatively, that even after she filed her claim on April 4, Grange could have inspected the pipes piled in the basement, the dumpster containing debris, and the areas of the house where the walls were not yet finished. The district court was unmoved:

> Grange could have, many months after the incident, inspected a pile of removed broken pipes in the basement, maybe could have sorted through debris in a dumpster, could have looked at a handful of photographs, and could have sought

7

> out various individuals who are alleged to have performed the work for cash. But none of this evidence could adequately answer the key threshold questions of what actually caused the claimed damage, how extensive that damage was, what work was actually necessary to repair the damage, and whether Grange would have approved the extensive remodel that [Keathley] undertook on her own[,] and [whether Grange] would have paid the same price for the repairs.

*Keathley*, 2019 WL 423838, at *11 (footnote omitted).

As already mentioned, the district court's opinion is complete, correct, and well-supported by the record. We will note additionally that Keathley does not appear to have complied with conditions 1.g and 1.i: "produce for examination, with permission to copy, all books of account, bills, invoices, receipts and other vouchers" and "cooperate with us in the investigation." And Keathley clearly did not comply with conditions 1.b and 1.c: "keep records of the costs of repairs" and "make an inventory of all damaged or destroyed property, showing in detail the quantity, cost, description, actual cash value and amount of loss claimed [and] [a]ttach all bills, receipts and related documents that justify the figures in the inventory." As a factual matter, this is undisputed.

In this de novo review from the grant of summary judgment we can affirm on any basis supported by the record. *Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield*, 722 F.3d 861, 865 (6th Cir. 2013) (quotation marks and citations omitted). Because Keathley's failure to provide any documentation whatsoever is fatal to her claim, we can also affirm on that basis.

Given our determination that Grange properly rejected Keathley's claim and the district court properly granted summary judgment to Grange, we need not address Keathley's argument that she is entitled to an adverse-inference instruction as a sanction for Grange's alleged spoliation of evidence stemming from Grange's inability to produce certain photos allegedly taken by adjustor Jason May during his May 28 site visit. But the district court's management of this issue warrants commendation. The court entertained this accusation through several rounds of motion practice, painstakingly directing Grange through an exhaustive investigation that ultimately

8

disproved Keathley's accusation entirely. *See Keathley*, 2018 WL 1406838, at \*5. We review a district court's decision on spoliation sanctions for an abuse of discretion, *Adkins v. Wolever*, 692 F.3d 499, 503 (6th Cir. 2012), and we find no abuse of discretion here, much less any error.

For the foregoing reasons, we AFFIRM the judgment of the district court.

**HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part**.

I agree with my colleagues that the district court did not abuse its discretion in denying Keathley's motion for spoliation sanctions. However, viewing the facts in the light most favorable to Keathley, there is a genuine dispute of material fact about whether she complied with the policy provisions requiring her to provide immediate notice of a covered loss and to exhibit the damaged property. Additionally, there is a genuine dispute of material fact about whether the known-loss exclusion applies to Keathley's claim for mold-abatement expenses. I would therefore reverse the grant of summary judgment to Grange.

**I.**

I first address whether Keathley complied with the immediate-notice provision, which states:

> **What to do in Case of Loss**
>
> If a covered loss occurs, the **insured person** must:
>
> a.      give immediate notice to **us** or **our** agent. In case of theft, also notify the police. In case of loss under Credit Card, Electronic Fund Transfer Card, Forgery and Counterfeit Money under Section I – Additional Coverages, also notify the issuer of the card or electronic fund transfer card or the bank . . . .

R. 77-1, PID 4566. "The purpose of provisions in an insurance contract requiring the insured to give prompt notice is to allow the insurer to make a timely investigation in order to evaluate claims and to defend against fraudulent, invalid, or excessive claims." *Dellar v. Frankenmuth Mut. Ins. Co.*, 433 N.W.2d 2380, 383 (Mich. App. 1988) (citing *Wendel v. Swanberg*, 185 N.W.2d 348, 352 (Mich. 1971)). Although the policy required "immediate" notice, Michigan courts construe such provisions as requiring notice within a reasonable time. *Tenneco*, 761 N.W.2d at 859 (citing *Wendel*, 185 N.W.2d at 353).

**A.**

The parties agree that if Keathley is deemed not to have provided notice until the April 4

email from Banks to Grange, Keathley did not comply with the immediate-notice provision. But

if Keathley's phone call to Lamerton within a week of the loss qualifies as providing notice, then

Keathley did satisfy the immediate-notice provision. The district court determined, and the

majority agrees, that Keathley's phone call to Lamerton did not satisfy the immediate-notice

provision:

> [I]t is undisputed that Ms. Lamerton was instructed by Plaintiff in the January 2014 phone call not to file a claim on her behalf and Ms. Lamerton did not report a claim to Grange or otherwise notify Grange of the occurrence reported by the Plaintiff. Ms. Lamerton's knowledge, even if imputed to Grange, was that Plaintiff was *not* giving notice of a covered loss and was *not* intending to file a claim. "Because [Grange] can only be imputed with the knowledge [] which [Lamerton] received during the scope of [her] authority[,]" Grange cannot be charged on these facts with notice that Plaintiff was seeking to file a claim for a covered loss. Here, Ms. Lamerton specifically received notice of *no* claim, knowledge which, if imputed to Grange, is just that: *not notice* of a claim or notice of *no claim*. What does Plaintiff propose Grange could have done with such knowledge – arrive at the Property to investigate an occurrence for which a claim had not been filed? Finding notice sufficient under such circumstances would undermine the very purpose of the immediate notice provision, which is to give the insurer the opportunity to promptly investigate and evaluate a claim. Where no claim is being made and the insurer is not in fact apprised of the occurrence, any "notice" given to an agent is necessarily "not notice" to the insurer to begin the investigative process.

R. 92, PID 5920 (alterations in original) (quoting *First Mercury Ins. Co. v. Christopher K. Corp.*,

No. 09-14918, 2011 WL 3497294, at *6 (E.D. Mich. Aug. 10, 2011)). The district court also relied

on the wording of Banks's email to Grange, in which Banks stated that she was writing to "file a

new claim on behalf of [Keathley]." R. 74-6, PID 4240. According to the district court, this was

"[p]erhaps the most telling evidence that the . . . phone call to Ms. Lamerton was *not* notice to

Grange under the policy." R. 92, PID 5920.

The district court conflated the required notice and the submission of a claim by

concluding, in effect, that the notice provision requires immediate notice of a *claim* upon discovery

of a covered loss. But this is inconsistent with Keathley's proposed reasonable reading of the policy, which simply requires notice when a "covered loss" occurs. Grange argues that "covered loss" means "a loss for which the insured person seeks coverage," Appellee's Br. at 15, and thus notice of loss for which the insured does not intend to seek coverage is insufficient. In other words, Grange asserts that notice of a "covered loss" essentially means notice of a "claim." Grange further disputes Keathley's attempt to draw a distinction between "loss" and "claim," arguing that other language in the policy shows that "loss" means "claim." In particular, Grange argues that the section entitled "How Losses Are Settled" addresses how claims are settled but does not use the word "claim," instead referring solely to "losses." Thus, according to Grange, the policy uses these terms interchangeably.

Cutting against Grange's interpretation, as Keathley highlights, is a separate provision that expressly addresses the timing of when an insured must file a claim for loss:

**Suit or Claims Against Us**

We may not be sued unless there is full compliance with all the provisions and conditions of this policy. Any suit must be commenced against us within the applicable statute of limitations. A claim for loss must be submitted within one year after the loss or damage occurs.

R. 77-1, PID 4569. Thus, under the policy, although an insured is required to give notice within a reasonable time of when a covered loss occurs, the insured has up to one year to file a claim for loss. This suggests that providing notice of loss and submitting a claim are distinct events. Grange disputes this interpretation, arguing that "[t]he last sentence of the provision establishes a deadline after which a party is barred from filing suit against Grange." Appellee's Br. at 16. This interpretation is not persuasive because the previous sentence addresses when a suit against Grange must be filed, and it expressly provides that a *suit* against Grange must be filed within the applicable statute of limitations. This is different from when a *claim* for loss must be submitted, which is capped at one year.

12

Grange further argues that the one-year claim-for-loss provision is intended to address a situation where a loss is not discovered immediately; in that case, the insured does not forfeit coverage so long as she discovers and files a claim for that loss within one year. This is a plausible reason for why this provision is included, but it does not change the fact that the provision also sets an outer boundary for when an insured must file a claim without mention of when the loss is discovered.

At the very least, the policy is ambiguous. Neither "covered loss" nor "claim" is defined; and there is no provision stating what must be contained in the "immediate notice" of a "covered loss."[1] Given the other provisions in the policy, it is reasonable for an insured to conclude that the immediate-notice provision is satisfied if she provides notice that a loss occurred, even if she is unsure about filing a claim or is unwilling to do so at that moment. *See Leonor v. Provident Life & Acc. Co.*, 790 F.3d 682, 687 (6th Cir. 2015) (applying Michigan law and explaining that "[u]nder Michigan law, courts are to construe [an insurance] contract in favor of the insured if an ambiguity is found. A contract is said to be ambiguous when its words may reasonably be understood in different ways. Thus, for [the insured] to prevail, his interpretation must be reasonable, but it need not be superior to the insurers." (first alteration in original) (internal quotation marks and citation omitted)).

Next, the majority accepts Grange's argument that notice to Lamerton cannot constitute notice to Grange because Keathley instructed Lamerton to withhold reporting the claim to Grange. Keathley, however, testified that she told Lamerton that she did not want to file a claim at the time of the phone call and that she was going to try to make the repairs herself, and that, in response, Lamerton, as "a representative of claims," told Keathley that she could proceed in making repairs

---

[1] In contrast, the liability section of the policy sets forth precisely what needs to be conveyed in the notice of occurrence, including the insured's name and policy number, details about the accident, and information about victims and witnesses.

and that she had six months to file a claim. Keathley also testified that she phoned Lamerton several times to keep her apprised of what was going on. R. 74-3, PID 4064.

Accordingly, construing the ambiguous provisions of the policy in favor of Keathley and drawing all reasonable inferences in her favor, Keathley provided notice to Lamerton of a covered loss in the phone call informing Lamerton that the property had sustained water damage as a result of frozen pipes, which was a loss for which the policy provided coverage.

**B.**

For the notice to Lamerton to be effective, however, Lamerton must have been Grange's agent for purposes of receiving notice—the policy expressly provides that the insured must "give immediate notice to [Grange] or [Grange's] agent." R. 77-1, PID 4566. "As a general rule, knowledge of, or notice to, an insurance agent as to a matter within the scope of his authority, and which is acquired while the agent is acting within the scope of his authority, is chargeable to the insurer." *Palmer v. Pac. Indem. Co.*, 254 N.W.2d 52, 57 (Mich. App. 1977) (citing *Wendel*, 185 N.W.2d at 352 n.7).

Keathley argued below that Lamerton was acting as Grange's agent pursuant to an agency agreement between Lamerton's employer, Insurance One, and Grange that granted Insurance One the authority to solicit insurance for a commission, bind insurance contracts, "[p]rovide all the usual and customary services of an insurance agent on all insurance contracts placed by the Agent with [Grange]," and collect and receive premiums from the insured. R. 77-20, PID 5245. The agreement also requires Lamerton to maintain her license "to represent [Grange] as an Agent," and to "[p]romptly report all claims and legal actions to [Grange]." *Id.* at PID 5245-46. Further, Keathley argued that she was justified in relying on Lamerton's statements during the phone call

that it was permissible for Keathley to make repairs herself and that she would have six months[2] to file a claim if it became too expensive. Thus, Keathley argued that Lamerton had actual and apparent authority to act as Grange's agent in receiving notice of a covered loss.

Grange did not address these arguments in response. Rather, Grange asserted that Keathley's arguments were "red herrings intended to deliberately divert attention away from Plaintiff's express instruction to withhold notifying Grange of her claim." R. 78, PID 5319 (emphasis omitted).[3] The district court addressed Keathley's arguments, however, and found that nothing in the agency agreement suggested that Lamerton had authority to receive notice of insurance claims or investigate any claim losses.

Grange does not attempt to defend the district court's reasoning. Rather, it downplays the importance of this reasoning, and then states that the agency agreement "does not clearly spell[] out the Agents [sic] authority to receive a notice from an insured of an alleged loss for which she is not seeking coverage." Appellee's Br. at 20. However, Grange then appears to concede that Lamerton had authority to receive notice of a loss for which an insured is seeking coverage. Appellee's Br. at 21 ("Grange never argued, and the district court never determined the agent lacked authority to receive notice of loss for which an insured person was seeking coverage, since ***such notice*** would constitute a claim the agent is obligated to report to Grange under the Agency Agreement."). Thus, Grange essentially repackages its argument that the notice was ineffective under the policy because it was notice of no claim.

Viewing the evidence in the light most favorable to Keathley and drawing all reasonable inferences in her favor, Lamerton had authority to act as Grange's agent in receiving notice of a

---

[2] The policy allows one year to submit a claim for loss, not six months.

[3] I note that Keathley's testimony does not establish that she gave an express instruction to withhold notifying Grange. Rather, Keathley testified that she told Lamerton that she did not want to file a claim and would attempt to make the repairs herself.

covered loss under the policy. First, Grange appears to concede that the agency agreement gave Lamerton authority to receive notice under the policy—although Grange argues that Lamerton was not authorized to receive notice of "no claim," it concedes that had Keathley given proper notice to Lamerton, it "would constitute a claim the agent is obligated to report to Grange under the Agency Agreement." Appellee's Br. at 20-21. Second, the agency agreement itself suggests that Lamerton is Grange's agent for the purpose of receiving notice of a covered loss. In addition to providing that Lamerton must maintain her license "to represent [Grange] as an Agent" and to "[p]romptly report all claims and legal actions to [Grange]," Lamerton was also given authority to "[p]rovide all the usual and customary services of an insurance agent on all insurance contracts placed by the Agent with [Grange]." R. 77-20, PID 5245-46. Consistent with the agreement, Keathley testified that Lamerton represented herself as "a representative of claims" to Keathley, and told her she was free to make repairs and file a claim later because she had told Lamerton of the incident. R. 74-3, PID 4063. Further, there is no testimony that Lamerton was not authorized to receive notice of a covered loss from insureds on behalf of Grange.[4]

Accordingly, viewing the evidence in the light most favorable to Keathley and drawing all reasonable inferences in her favor, Keathley's phone call to Lamerton fulfilled the "immediate-notice-to-us-or-our-agent" provision under the policy.

## II.

The district court alternatively found that Keathley breached the policy provision requiring Keathley to exhibit the damaged property to Grange. That provision states:

---

[4] In a separate section of its appeal brief, Grange asserts that Lamerton was not a captive agent for Grange and thus is considered an agent of the insured rather than the insurer under Michigan law. Grange did not argue this point below—it declined to brief Lamerton's authority at all—and it mentions this argument only in passing on appeal.

**What to do in Case of Loss**

If a covered loss occurs, the **insured person** must:

. . . .

  e.  exhibit the damaged property to **us** or **our** representative, as often as may be
      reasonably required . . . .

R. 77-1, PID 4566.

The district court noted that Grange argued that this provision "works in tandem with the notice provision" and that Grange "merely incorporate[d] its arguments made with respect to the notice provision." R. 92, PID 5933. The district court, having found that Keathley's February notice to Lamerton was not notice under the policy, analyzed whether Keathley breached this provision by assuming that Keathley did not provide notice of the covered loss until Banks's April 4 email to Grange. The district court concluded that Keathley failed to comply with the provision because demolition was completed and extensive repairs had been made before Keathley notified Grange of the loss.

The provision states that Keathley must exhibit the damaged property "as often as may be reasonably required," and thus Keathley only violates the provision if she fails to exhibit the property when requested (or "required") by Grange. Grange, however, did not attempt to inspect the property until May 28 despite its agent receiving notice within a week of the loss and despite Banks's repeated requests to May to inspect the property sooner. Further, as Keathley points out, the policy requires Keathley "to protect the property from further damage" by "making necessary and reasonable repairs to protect the property." R. 77-1, PID 4566.[5] Keathley informed Lamerton and later Banks informed Grange that Keathley was making repairs to the property; no one ever

---

[5] As the majority notes, other provisions of the policy require Keathley to keep records of the costs of repairs, to make an inventory of the damaged property showing the value and amount of loss claimed, and to cooperate in the investigation. Whether Keathley complied with these provisions is not at issue in this appeal because Grange did not move for summary judgment on the basis of these provisions or argue these issues on appeal. Although we may, in general, affirm on any basis supported by the record, I would not do so here where the parties never briefed the issues and the district court never addressed them.

told Keathley to stop, and Lamerton expressly told Keathley that she could make repairs and file a claim later. And, according to Keathley, Banks, and Tison, when May conducted his inspection, the broken pipes were in the basement, at least one dumpster was still on site containing the debris and materials removed from the house, and there was other visible damage in the house.[6] Thus, there is a factual dispute regarding whether Keathley complied with this provision of the policy and whether any failure to comply prejudiced Grange.

### III.

Next, Keathley argues that the district court erred in granting summary judgment to Grange for any damages related to mold abatement in the basement. The district court reasoned that the policy's "known loss" provision excluded coverage for damage resulting from basement mold because Keathley was aware of the mold at the time coverage was bound. The policy provides that Grange "does not provide coverage for any loss or occurrence which was known to any insured person and occurred prior to the time you signed the application for coverage, or asked us or our agent to provide coverage, even if the loss or occurrence falls within the period covered by the policy." R. 77-1, PID 4579.

In connection with the purchase of her home, Keathley obtained an inspection report from Matt Dalfino in October 2013. The inspection report stated, in relevant part, "MOLD ABATEMENT NEEDED THROUGHOUT BASEMENT AREAS. ALL MOLD ABATEMENT MUST BE DONE IN ACCORDANCE TO EPA PROTOCOLS FOR OCCUPANTS [sic] HEALTH AND SAFETY!" R. 74-9, PID 4473. The report did not contain details about the extent of the mold beyond stating in a few places that the inspector observed mold or mildew on drywall finishes in the basement and basement bathroom. The district court found that the known-loss

---

[6] The testimony is unclear whether or how many dumpsters may have been removed from the property prior to May's inspection.

exclusion applies because it was undisputed that no formal mold abatement was conducted on the property before the pipes burst; that Keathley could not reasonably believe that the prior owners had sufficiently addressed the mold by painting over the mold or spraying "Kilz" on it; and because Keathley had obtained a significant price reduction for the purpose of conducting mold abatement.

Keathley testified that after she received the inspection report, she obtained a $4500 price reduction due primarily to the improper installation of the sump pump, necessary repairs in the basement bathroom, and the mold and mildew in the basement bathroom. She also testified that she spoke with the inspector about the mold and mildew issue and based on that conversation she was primarily concerned about mold in the bathroom area and around the sump pump in the basement. Keathley believed that the prior owners had taken care of the mold problem because they "had some kind of insurance that covered it," although she was not sure exactly "what they did." R. 74-3, PID 4001. They also "replaced the sump pump, so the only thing [Keathley] did was push the sump pump outside the house away from the home further away, had a company come out and do it." *Id.* Keathley further testified that one of the prior owners "addressed the issue before we purchased the home" by spraying Kilz on the affected areas and painting the areas. *Id.* at PID 4002.

In April 2014, Banks requested the property be assessed for the presence of mold. The report found evidence of mold throughout the basement, including on the floor joists, subfloor, supports, and drywall. As the district court noted, there was no evidence establishing whether the mold in April 2014 was the same mold observed in October 2013.

Keathley argues that a subjective standard applies and that her testimony at least creates a genuine dispute of material fact about whether she knew that the mold issues identified by the inspector had not been abated. *See S. Macomb Disposal Auth. v. Am. Ins. Co.*, 572 N.W.2d 686, 697 (Mich. App. 1997) (discussing the difference between objective and subjective language in a

known-risk exclusion). Although the district court acknowledged that a subjective standard applies, Keathley argues that the district court applied an objective standard, rejecting as *unreasonable* Keathley's belief that the mold issue had been abated. Keathley further identifies facts not considered by the district court in its decision, including that the prior owners had insurance that covered mold abatement and that the sump pump had been repaired and moved further from the house.

Viewing the evidence in the light most favorable to Keathley and applying a subjective standard, there is a genuine dispute of material fact about whether Keathley knew the prior mold issue had not been abated at the time coverage was bound. Accepting Keathley's testimony as true, she believed based on her own observations and conversations with the prior owner that the mold problem had been abated through efforts by the prior owner. Nothing in the test report from April 2014 calls this testimony into question, and Grange does not attempt to argue otherwise. The April 2014 test report in fact suggests that at least some of the mold was entirely new, as it was documented in different areas of the basement than the mold noted in the October 2013 report, and coverage is not excluded under the known-loss provision for any new mold issues. Given these facts and Keathley's uncontested arguments, I would reverse the grant of summary judgment in favor of Grange based on the known-loss exclusion for damages related to mold abatement.

**IV.**

For the foregoing reasons, I would reverse the grant of summary judgment, affirm the denial of spoliation sanctions, and remand for further proceedings.